810 So.2d 854 (2002)
William Earl SWEET, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1509.
Supreme Court of Florida.
January 31, 2002.
*856 Michael P. Reiter, Capital Collateral Counsel-Northern Region, John M. Jackson, Assistant CCRC, and Kimberly L. Sharkey, Assistant CCRC-Northern Region, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
William Earl Sweet appeals the trial court's denial of postconviction relief after an evidentiary hearing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the trial court's order denying Sweet postconviction relief.
Sweet, who was twenty-three years old at the time of the offenses, was convicted of first-degree murder, three counts of attempted first-degree murder, and burglary. See Sweet v. State, 624 So.2d 1138, 1139 (Fla.1993). The facts of the crime are detailed in this Court's opinion on direct appeal.
On June 6, 1990, Marcine Cofer was attacked in her apartment and beaten and robbed by three men. She could identify two of the men by their street names. On June 26, 1990, she was taken by Detective Robinson to the police station to look at pictures to attempt to identify the third assailant. When Robinson dropped Cofer off at her apartment, William Sweet was standing nearby and saw her leave the detective. Unknown to Cofer, Sweet had previously implicated himself in the robbery by telling a friend that he had committed the robbery or that he had ordered it done. Cofer asked her next-door neighbor, Mattie Bryant, to allow the neighbor's daughters, Felicia, thirteen, and Sharon, twelve, to stay with Cofer in her apartment that night. Mattie agreed, and the children went over to Cofer's apartment around 8 p.m.
At approximately 1 a.m. that evening, Sharon was watching television in the living room of Cofer's apartment when she heard a loud kick on the apartment door. She reported this to Cofer, who was sleeping in the bedroom, but because the person had apparently left, Cofer told Sharon not to worry about it and went back to sleep. Shortly thereafter, Sharon saw someone pulling on the living room screen. She awakened Cofer. The two then went to the door of the apartment, looked out the peephole, and saw Sweet standing outside. Sweet called Cofer by name and ordered her to open the door.
At Cofer's direction, Felicia pounded on the bathroom wall to get Mattie's *857 attention in the apartment next door, and a few minutes later Mattie came over. The four then lined up at the door, with Cofer standing in the back of the group. When they opened the door to leave, Sweet got his foot in the door and forced his way into the apartment. Sweet's face was partially covered by a pair of pants. He first shot Cofer and then shot the other three people, killing Felicia. Six shots were fired. Cofer, Mattie, and Sharon were shot in the thigh, ankle and thigh, and buttocks, respectively, and Felicia was shot in the hand and in the abdomen.
Id. The jury recommended a sentence of death by a vote of ten to two, and the trial court followed this recommendation. See id. The trial court found four aggravators[1] and no statutory mitigators, but found as a nonstatutory mitigating circumstance that Sweet "lacked true parental guidance as a teenager." Id. at 1142.[2]
On direct appeal, this Court affirmed Sweet's convictions and sentence of death. See id. at 1143.[3] Sweet timely filed a motion for postconviction relief on August 1,1995, and filed an amended motion on June 30, 1997, raising twenty-eight claims.[4] *858 A Huff[5] hearing was held on February 20, 1998. The trial court granted an evidentiary hearing, which was held from January 25 through January 28, 1999, on the following four claims: (1) trial counsel, Charlie Adams, failed to investigate and present evidence of other suspects; (2) Adams failed to present, as potentially mitigating evidence, Sweet's background history; (3) Adams failed to present background information to the mental health experts; and (4) the mental health experts conducted an inadequate evaluation. The trial court summarily denied Sweet's remaining claims. After the evidentiary hearing, the trial court denied relief on the four remaining claims. Sweet now appeals the trial court's denial of postconviction relief, raising six issues for this Court's review.[6]

1. INEFFECTIVE ASSISTANCE OF COUNSEL DURING GUILT PHASE
In order to establish an ineffective assistance of counsel claim, a defendant must prove two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made *859 errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216, 219-20 (Fla.1998). To establish deficiency, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" based on "prevailing professional norms." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. To establish prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. Ineffective assistance claims present a mixed question of law and fact which is subject to plenary review. See Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999). "This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings." State v. Riechmann, 777 So.2d 342, 350 (Fla.2000). Moreover, because the "Strickland standard requires establishment of both prongs, where a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." Waterhouse v. State, 792 So.2d 1176, 1182 (Fla.2001).
In Sweet's first claim, he asserts that the trial court erred in denying his ineffective assistance claim during the guilt phase with regard to Adams' failure to investigate and present evidence of other suspects and individuals who would have refuted the State witnesses' identification of Sweet as the shooter. Sweet contends that his theory of defense was that he was innocent and that the State's witnesses misidentified him as the shooter. Sweet claims that three witnessesDale George, Jesse Gaskins, and Anthony McNishwere available to either identify other individuals as the shooter or to establish that Sweet was not the shooter, and that trial counsel rendered ineffective assistance by failing to utilize these witnesses at trial.
As to Dale George, Sweet contends that Adams rendered ineffective assistance in failing to investigate George as a suspect. George was Marcine Cofer's boyfriend, and he lived with Cofer at the time of the shooting. Sweet maintains that Adams rendered ineffective assistance in failing to investigate George as a possible suspect for several reasons. First, Adams had police reports containing several domestic violence petitions that Cofer filed against George, alleging that George had threatened to kill her and that Cofer feared for her life. Second, the evidence at trial showed that in the afternoon preceding the night of the shooting, George took the clip out of Cofer's gun. Third, evidence was presented at trial that George was involved in drug-dealing activity with Cofer, and Sweet alleges that this could have provided an alternative motive for the shooting. Fourth, the State's theory of prosecution in this case originated with George, and Sweet contends that this should have raised a red flag that a potential suspect was trying to shift the blame to another.
Although Adams' theory of defense in this case was that someone else killed the victim, Adams never put on evidence of *860 other suspects at trial. At the evidentiary hearing, Adams admitted that evidence of other potential suspects would have been helpful. However, Adams stated that he never considered George a suspect because there was no credible reason why Cofer and her neighbor, Sharon Bryant, could not identify George if he was the shooter. Bill Salmon, who was accepted at the evidentiary hearing as an expert on capital cases, stated that the failure to investigate George as a suspect presented a "close question" as to whether Adams acted deficiently. Salmon ultimately concluded, however, that Adams should have presented George to the jury as an alternative suspect. At a minimum, Salmon concluded, Adams should have investigated and considered George before making the determination of whether George should take the stand.
In rejecting Sweet's contention that Adams rendered ineffective assistance in failing to investigate George as a potential suspect, the trial court explained:
In the defendant's second claim under this ground, he alleges that counsel failed to investigate other possible suspects who would have had a motive to kill Marcine Cofer.... The only other person that the defendant suggests had a motive to kill Cofer was Dale George. Dale George was not only Cofer's boyfriend, he lived with Cofer, and he was known to Sharon Bryant. There was no evidence presented as to why George would have had any problem getting into the home that he lived in, as did the murderer, nor why either Cofer or Bryant would not have identified George as the person they saw through the peep hole in the front door and who had shot them.
We agree with the trial court's conclusion that Adams' performance was not deficient in failing to pursue George as a possible suspect. There was no evidence in this case that George was involved in the shooting, and Sweet presented no evidence at the evidentiary hearing that George was a possible suspect. Further, there was no evidence that the police ever considered George to be a suspect so as to lead us to a conclusion that Adams was deficient in not pursuing George as an alternative suspect. See Haliburton v. Singletary, 691 So.2d 466, 470-71 (Fla. 1997) (holding that counsel's decision not to use a possible witness was not "so patently unreasonable that no competent attorney would have chosen" to forego the witness's testimony).
Sweet next contends that Adams rendered ineffective assistance in failing to call Jessie Gaskins as a witnesses. At a pretrial deposition, Gaskins stated that someone pulled a gun on him and made him knock on Cofer's door on the night of the murder. Gaskins described the person as wearing a ski mask and did not mention whether or not the person was wearing jewelry. Sweet contends that this testimony is inconsistent with the identification of Sweet by Cofer and Bryant.
At trial, Bryant described the shooter as wearing rings on his fingers and a beaded necklace with a crucifix on the end. Moreover, Bryant stated that the shooter was wearing a blue jean pant leg over his face. Bryant also identified Sweet in a photographic spread at the police station and at trial. Although she stated that she saw Sweet directly through the door peephole, she also testified that she did not actually see the face of the shooter. Furthermore, Cofer described the shooter at trial as having something covering his face, like "a piece of clothing." She testified that this clothing was not covering the shooter's entire face, and that she recognized Sweet's eyes, nose, and a "partial of his face" through the clothing. Cofer identified Sweet as the shooter when the police *861 came to investigate the murder scene, and while she was in the hospital, she picked Sweet out of a photographic spread.
At the evidentiary hearing, Adams testified that he did not use Gaskins as a witness because Gaskins had made an out-of-court statement identifying Sweet as the shooter after he saw Sweet on television. Moreover, Adams explained that Gaskins gave the police a signed statement saying that the man Gaskins saw on television looked like the man who made him knock on Cofer's door. Therefore, Adams did not want to risk the possibility of a third eyewitness identification of Sweet as the shooter.
When asked about Adams' performance with regard to Gaskins, Salmon stated: "Gaskins would at least have given the jury something to think about ... food for thought" with regard to Sweet's identification. Salmon stated that this "food for thought" also would have carried over to the penalty phase in allowing the jury to consider a penalty less than death. With regard to Gaskins' identification of Sweet as the shooter, Salmon stated that he believed that the identification would not have been admissible because of either relevancy or materiality. Moreover, Salmon felt that Gaskins' identification was "equivocal," and that he would not have been troubled by putting Gaskins on the stand even with Gaskins' out-of-court statement. However, upon cross-examination, Salmon admitted that the State could have brought out Gaskins' statement if Gaskins testified, and that it may have been a strategic decision not to put him on the stand.
We conclude that Adams was not deficient in deciding not to call Gaskins. The record demonstrates that Adams made a strategic decision not to call Gaskins as a witness based upon the possibility that Gaskins' out-of-court identification could have come in at trial. See Maharaj v. State, 778 So.2d 944, 959 (Fla.2000) (holding that counsel's strategic reason not to call alibi witness could not constitute deficient performance); Rose v. State, 675 So.2d 567, 570 (Fla.1996) (same).
Finally, Sweet contends that Adams rendered ineffective assistance in failing to ensure that Anthony McNish appear at trial. Adams had subpoenaed McNish to appear at trial, but he did not show up. At trial, Adams told the court that McNish would have testified that he was on his way home at the time of the shooting and that he passed Cofer's house. McNish would have testified that he saw three black males come up to the apartment in the alley, but also would have testified that it was dark. McNish had known Sweet for five or six years, and would have testified that none of the three men walked like Sweet or were built like Sweet. Adams also told the trial court that McNish was supposed to come to court the day before, and, when he did not show up, Adams contacted McNish. McNish stated that he was confused as to the date, but assured Adams that he would appear the following day. That next day, when McNish failed to appear, Adams requested a thirty-minute continuance to find McNish, and the trial court granted him fifteen minutes. Forty-five minutes later, Adams told the trial court that he went to both McNish's residence and McNish's grandmother's residence, and that McNish could not be found. The trial court stated: "It seems like you've certainly made extraordinary efforts to locate Mr. McNish and have him here."
McNish testified at the evidentiary hearing. McNish stated that the three men at Cofer's door walked differently than Sweet, and that the three men each had a different skin complexion and physical build than Sweet. McNish admitted that he received the subpoena Adams sent, but *862 that he never read it. Moreover, McNish stated that he read the date of the subpoena, but did not read the part of the subpoena instructing him to call Adams. McNish claimed that he did not go to court on the date instructed because he had to watch his daughter. McNish stated that he ultimately did call Adams, and told Adams that he had no transportation. Adams disputed that McNish ever told him that he needed transportation.
The State established on cross-examination that McNish had been convicted of seven felonies, including crimes involving dishonesty. Further, although he stated at a pretrial deposition that he could not see any of the three mens' faces at Cofer's door, that it was dark, and that he had bad eyesight, he explained at the evidentiary hearing that, after thinking about it, he had a good idea of what the three men looked like. However, he repeated at the evidentiary hearing that he had bad eyesight and never got a good look at the three men. Moreover, McNish never saw any of the men wearing a mask, and he did not actually see the men knock on the door. Finally, McNish stated at the evidentiary hearing that he could identify one of the men that was at Cofer's door now, but he refused to reveal the name of the person. He did state that the man is not Sweet.
The trial court found that Sweet failed to demonstrate either deficient performance or prejudice, explaining:
The evidence at the hearing established that counsel had listed and intended to use McNish as a witness, that McNish appeared at a deposition by the State pursuant to subpoena, that McNish had assured counsel that he would appear at trial, that he had been subpoenaed by counsel to appear at trial (but had not read that subpoena), and that counsel secured a recess in the trial to go to McNish's house and to McNish's grand-mother's house in order to locate McNish, but was unsuccessful in his efforts. This Court specifically finds that counsel was not ineffective in his efforts to secure McNish's appearance at trial. Moreover, given McNish's inconsistent testimony at the evidentiary hearing and complete evasiveness regarding a critical piece of newly divulged evidencesome eight years after the fact, the jury would find McNish's testimony to be as incredible as this Court found it to be, and therefore, the defendant has also failed to show any actual prejudice as well.
We agree with the trial court that Sweet demonstrated neither deficient performance nor prejudice with regard to McNish.
In short, none of these claims refute the overwhelming evidence of guilt presented by the State. Further, "[e]ven assuming any deficiency in trial counsel's guilt-phase performance, there is no reasonable probability, sufficient to undermine our confidence in the outcome, that the result of the proceeding would have been different." Rutherford, 727 So.2d at 220.

2. INEFFECTIVE ASSISTANCE DURING PENALTY PHASE
In Sweet's second claim, he asserts that trial counsel rendered ineffective assistance in failing to present readily available mitigating evidence during the penalty phase. Sweet actually raises several separate but related claims. First, Sweet contends that trial counsel was ineffective in presenting the testimony of his sister, Deonne Sweet, during the penalty phase. Second, Sweet argues that Adams was ineffective in failing to present Sweet's mother, Bertha Sweet, and Sweet's foster mother, Emily Shealey, during the penalty phase. Finally, Sweet maintains that Adams was ineffective in failing to present available mental mitigation during the penalty *863 phase. We address each claim individually, but also evaluate the cumulative effect of the additional mitigation in order to determine whether Sweet has demonstrated prejudice.
At the penalty phase, Adams relied solely on Deonne Sweet to provide mitigation testimony. Adams explained at the evidentiary hearing that he had several meetings with Deonne where he discussed the types of things he would ask during the penalty phase. He asked Deonne if she had the names of any family members he could speak to, and he stated that she did not give him any information.[7]
Deonne testified to the following at trial. She and Sweet grew up without a father. Growing up with her mother was "normal." However, she also testified that their mother was an alcoholic "on and off." Deonne stated that she did not know if their mother's alcoholism affected Sweet, but that it did not affect her. Deonne explained that she raised Sweet for a period of time, and that Sweet was a good uncle to Deonne's daughter. Deonne testified that Sweet never caused any problems for her when she was raising him. Finally, Deonne stated that she and Sweet were in a foster home because of their mother's neglect and alcoholism, and that Sweet was in a foster home for approximately two years.
At the evidentiary hearing, Deonne elaborated on her prior trial testimony. The new portions of her testimony included the fact that Sweet never knew his father, and that his father never acknowledged Sweet as his son. Sweet sometimes witnessed their mother fighting with her boyfriends and their mother would sometimes hide from them. Sweet had behavioral problems in school and could not sit down and pay attention. Furthermore, Sweet had a stuttering problem for which he went to speech therapy. Sweet was sent to a juvenile facility in Marianna. Sweet was never physically abused.
Sweet contends that defense counsels' lack of preparation in presenting Deonne's testimony constituted deficient performance. However, we need not decide this issue, as we conclude that, based solely on Deonne's testimony at the evidentiary hearing, Sweet has failed to establish prejudice. See Waterhouse, 792 So.2d at 1182 (where defendant fails to make showing as to one prong of Strickland, it is unnecessary to analyze the other prong). We conclude that although Deonne elaborated on her trial testimony during the evidentiary hearing, this additional testimony was essentially cumulative.
As to Sweet's claim that his counsel was ineffective in failing to have his mother and foster parent testify, the trial court found that Adams did speak to various potential witnesses concerning mitigation, including Sweet's mother, his girlfriend, his girlfriend's mother, and his foster parents. Furthermore, we note with regard to this mitigation, that this is not a case where Adams failed to investigate any available mitigating witnesses. See, e.g., Rose, 675 So.2d at 572; Heiney v. State, 620 So.2d 171, 173 (Fla.1993).
We do not, however, reach the issue of whether Adams was deficient in failing to have additional penalty phase *864 witnesses testify, because, having reviewed the testimony of the witnesses at the evidentiary hearing, we agree with the trial court that Sweet did not establish prejudice under this claim. Although Bertha Sweet's testimony at the evidentiary hearing did present some new facts concerning Sweet's childhood, the majority of the testimony was cumulative to Deonne's trial testimony. Not only was the testimony cumulative to Deonne's testimony that was actually presented at trial, but presenting Bertha as a witness would have opened the door to cross-examination about Sweet's juvenile record.
For example, Bertha stated that Sweet got into trouble a number of times as a juvenile and was sent away to the Dozier School for Boys in Marianna. Sweet was suspended from school for misconduct and he would get into fights at school. Bertha testified that Sweet was arrested for battery in 1981 for hitting another child and that he was taken into custody for being ungovernable. Moreover, Sweet began stealing things at a very young age and this continued into his teenage years. Bertha also testified that Sweet was once arrested for stealing a bicycle. Thus, to the extent that the jury may have benefitted from this additional testimony, the jury also would have heard potentially damaging information regarding Sweet's juvenile record and prior violent behavior. Moreover, none of Bertha's testimony established any statutory mitigation or refuted any statutory aggravation.
We also reject Sweet's ineffective assistance claim with regard to the failure to call Sweet's foster mother, Emily Shealey, as a witness during the penalty phase. Adams spoke with Shealey before trial. At the evidentiary hearing, he stated that he did not present her as a witness because of "something she said," although he could not remember what specific thing she said that caused him concern. At the evidentiary hearing, Shealey testified that when Sweet arrived at her house, Sweet told her that his mother was not taking care of him and was drinking a lot. Shealey also stated that Sweet did not do well in school at first, but Shealey "straightened him out" and placed him on Ritalin. Moreover, Sweet behaved well in Shealey's home, and got along with Shealey's son. However, she also acknowledged that Sweet stole from a store at least three times and misbehaved a lot in class. Salmon conceded at the evidentiary hearing that by placing Shealey (as well as Bertha Sweet) on the stand, the State would have been able to elicit Sweet's juvenile criminal history through cross-examination.
Similar to Bertha Sweet's testimony, we conclude that Shealey's testimony was cumulative to that of Deonne's. In fact, Shealey's testimony probably would have been damaging, in that Sweet's juvenile criminal history would likely have been disclosed to the jury. Moreover, none of Shealey's testimony established any statutory mitigation or refuted any statutory aggravation in this case.
Sweet's final contention of penalty phase ineffectiveness is that Adams rendered ineffective assistance in failing to request the appointment of a mental health expert to evaluate Sweet. At the evidentiary hearing, Sweet presented the testimony of Drs. Ernest Miller and Jethro Toomer. Dr. Miller, a retired professor of psychiatry, was appointed by the trial court to evaluate Sweet for competency. Dr. Miller rendered a report in which he found Sweet competent to stand trial. However, Adams never submitted the competency report into evidence or pursued with Dr. Miller the potential for further examination of Sweet in order to establish mental mitigation.
*865 As we stated in Rutherford, 727 So.2d at 223:
In evaluating the Strickland prongs of deficiency and prejudice, it is important to focus on the nature of the mental mitigation Rutherford now claims should have been presented. This focus is of assistance when determining whether trial counsel's choice was a reasonable and informed strategic decision, as well as whether the failure to present such testimony (assuming that the failure amounted to a deficiency in performance) deprived the defendant of a reliable penalty phase proceeding.
Dr. Toomer, a clinical and forensic psychologist, evaluated Sweet for the purposes of the evidentiary hearing. Dr. Miller's testimony contradicted Dr. Toomer's testimony. Dr. Toomer testified that he did not administer the Minnesota Multiphastic Personality Inventory ("MMPI") because "there is nothing suggesting the existence of any severe form of mental illness or major mental illness" with regard to Sweet. Dr. Toomer testified about Sweet's family background and also stated that Sweet had an IQ of 88, which fell in the low-average range. Dr. Toomer stated that he did not test Sweet for organic impairment, but that Sweet did fall within the range of psychological problems. Dr. Toomer explained that, based on Sweet's background, there were a number of "red flags" concerning overall functioning. Dr. Toomer stated that Sweet was suffering from a personality disorder, in that he was dependent upon others, but did not suffer from an antisocial personality disorder. Dr. Toomer explained that he found no sign of organic brain damage and that Sweet did not fall into the mentally deficient category.
Further, Dr. Toomer testified that Sweet could not have committed the crime in a cold and calculated manner because, based upon Sweet's background, he did not act in a logical, premeditated manner. Moreover, Dr. Toomer stated that Sweet was unable to conform his conduct to the requirements of the law, based upon his impulsivity, and therefore, Sweet should have been able to establish a statutory mental mitigator. On cross-examination, Dr. Toomer conceded that Sweet had been able to conform his conduct to the requirements of law while in jail, but explained that this was due to the fact that he was in a structured environment. Moreover, Dr. Toomer stated on cross-examination that Sweet knew the difference between right and wrong at the time he committed the murder. Dr. Toomer also explained that Sweet was under the influence of an emotional disturbance at the time of the murder based upon his borderline personality disorder, and thus Sweet would have been able to establish another statutory mitigator.
In contrast to Dr. Toomer, Dr. Miller testified that Sweet suffered from an antisocial personality disorder. However, Dr. Miller explained that people who suffer from antisocial personality disorders may be capable of engaging in planning. Moreover, Dr. Miller stated that Sweet would sometimes have the capacity to satisfy the CCP aggravator, and that at other times Sweet would act out impulsively. Dr. Miller stated that Sweet was capable of engaging in long-range planning and forming the design to kill someone after deliberation. Yet Dr. Miller also testified that the defense might have been able to argue against CCP because of Sweet's impulsive behavior. Moreover, Dr. Miller stated that Sweet could appreciate the criminality of his conduct. Dr. Miller testified that he saw no evidence of brain damage or mental illness. Dr. Miller concluded that it was difficult to find anything directly and openly mitigating in this case and that the facts of this case suggest premeditation and planning.
*866 In rejecting the testimony that Sweet could not have formed the premeditation sufficient to establish the CCP aggravator and that Sweet was under an extreme emotional disturbance at the time of the murder, the trial court evaluated not only the testimony of the expert witnesses, but the other evidence at trial regarding the heightened premeditation that surrounded the planning and execution of this murder:
However, this Court finds that the evidence in this case contradicts Dr. Toomer's opinions. The evidence at trial overwhelmingly showed the defendant's motive and intent to eliminate the victim/witness to his prior robbery of that victim, and the defendant's own inculpatory statements to Manuela Roberts and Solomon Hansbury provide the icing on the cake.
We conclude that it is not reasonably probable, given the nature of all the additional mitigation, that this "altered picture would have led to the imposition of a life sentence, outweighing the multiple substantial aggravators at issue in this case." Rutherford, 727 So.2d at 226. We have carefully reviewed the evidentiary hearing testimony of Dr. Miller and Dr. Toomer and agree with the trial court that, given the nature of the mental health mitigation presented by these experts at the evidentiary hearing, Sweet has failed to demonstrate that he was deprived of a reliable penalty phase hearing. Moreover, we cannot conclude that the presentation of the testimony would have led to the imposition of a sentence other than death, given the four strong aggravators and the nature and extent of the additional mitigation evidence presented at the evidentiary hearing. We find this case similar to Rutherford:
Even if the additional mitigation evidence Rutherford presented at the 3.850 hearing had been heard and considered by the jury and original judge, it is not reasonably probable, given the nature of the mitigation offered, that this altered picture would have led to the imposition of a life sentence, outweighing the multiple substantial aggravators at issue in this case (HAC, CCP, and robbery/ pecuniary gain). Rutherford was not deprived of a reliable penalty proceeding.
727 So.2d at 225-26; see also Haliburton v. Singletary, 691 So.2d 466, 471 (Fla.1997) ("In light of the substantial, compelling aggravation found by the trial court [i.e., under sentence of imprisonment, prior violent felonies, committed during a burglary, and CCP] there is no reasonable probability that had the mental health expert testified, the outcome would have been different.").
As to the additional mitigation evidence presented through Deonne Sweet, Bertha Sweet and Emily Shealey, we conclude that the testimony is both cumulative and potentially harmful, as the testimony might have opened the door for the State to present negative information concerning Sweet's background. See Rutherford, 727 So.2d at 224-25 (explaining that essentially cumulative testimony presented during 3.850 evidentiary hearing was insufficient to establish prejudice in failing to present additional mitigation); see also Ventura v. State, 794 So.2d 553, 570 (Fla.2001) (holding that defendant could not establish prejudice where the mitigation presented at evidentiary hearing was cumulative of evidence presented at trial); Breedlove v. State, 692 So.2d 874, 878 (Fla.1997) (affirming denial of 3.850 relief where "the three aggravating factors we have previously affirmed [prior violent felony, during course of burglary, and HAC] overwhelm whatever mitigation the [3.850] testimony of [the defendant's] friends and family members could provide"). Accordingly, we reject Sweet's claim of ineffective assistance of counsel during the penalty phase.

*867 3. CUMULATIVE ERROR UNDER STATE v. GUNSBY, 670 So.2d 920 (Fla.1996)
In Sweet's third claim on appeal, he asserts that this Court must consider the evidence concerning Sweet's innocence disclosed during the evidentiary hearing in conjunction with Sweet's allegations of ineffective assistance. Specifically, Sweet asserts that because Solomon Hansbury, a witness at trial who claimed that Sweet confessed to the murder while they were in jail together, recanted his testimony at the evidentiary hearing, the trial court erred in failing to consider the cumulative effect of all the evidence not presented at Sweet's trial. In making this claim, Sweet relies upon this Court's decision in State v. Gunsby, 670 So.2d 920 (Fla.1996). In Gunsby the Court explained:
[W]hen we consider the cumulative effect of the testimony presented at the rule 3.850 hearing and the admitted Brady violations on the part of the State, we are compelled to find, under the unique circumstances of this case, that confidence in the outcome of Gunsby's original trial has been undermined and that a reasonable probability exists of a different outcome.
Id. at 924.
However, before we engage in a cumulative error analysis under Gunsby, we must first consider Hansbury's testimony. The trial court expressly rejected Hansbury's testimony at the evidentiary hearing, in which he recanted his earlier statement, as "incredible." As this Court explained in Armstrong v. State, 642 So.2d 730, 735 (Fla.1994), in rejecting a new trial based upon recanted testimony:
Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. In determining whether a new trial is warranted due to recantation of a witness's testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. "Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury." Only when it appears that, on a new trial, the witness's testimony will change to such an extent as to render probable a different verdict will a new trial be granted.
(Citations omitted.)
Certainly, the testimony of Hansbury standing alone would not rise to the level of requiring the granting of a new trial, and Sweet does not contend that he was entitled to a new trial based solely on Hansbury's recantation. Considering all of the testimony presented at the evidentiary hearing in this case, we reject Sweet's claim under Gunsby. As noted above, Sweet has failed to establish an ineffective assistance of counsel claim with regard to the guilt-phase proceedings. Therefore, we deny relief on this claim.

4. INEFFECTIVE ASSISTANCE IN FAILING TO PROVIDE COMPETENCY EXPERTS WITH SWEET'S BACKGROUND INFORMATION
In Sweet's fourth claim, he contends that Adams rendered ineffective assistance in failing to provide Dr. Miller and Maritza Cabrera with information concerning Sweet's background. The trial court rejected this claim, concluding:
This Court appointed two independent mental health professionals to examine the defendant, Dr. Ernest C. Miller, M.D., and Maritza Cabrera, M.A., CRC.... The [professionals'] report shows that the examiners were, in fact, aware of much of the information that *868 the defendant contends his counsel did not provide them with. The information in the report is stated in concise summarizations, as opposed to being recited in the detail that the defendant has stated it in his motion. The defendant did not call Dr. Miller as a witness at the hearing to establish his alleged lack of adequate information; rather, the State called Dr. Miller and established that his opinion would not have been different even when specifically considering the facts not specifically noted in his report. Therefore, this Court finds that the evidence failed to establish any prejudice to the defendant's mental health examination.
(Emphasis supplied.) The trial court's factual conclusions are supported by competent substantial evidence and we likewise conclude that Sweet has failed to demonstrate any prejudice. See Patton v. State, 784 So.2d 380, 393 (Fla.2000) (holding that defendant failed to demonstrate actual prejudice where competency expert testified that his opinion would not have changed even after considering additional information).
In a related claim, Sweet asserts that the mental health professionals who examined him failed to render adequate mental health assistance. Sweet contends that the professionals relied almost exclusively on what Adams provided, which was inadequate, and did not conduct an independent investigation into Sweet's family history. Sweet contends that the professionals might have reached a different conclusion as to Sweet's competency if they had engaged in a more thorough investigation of Sweet's background. However, because there is no evidence to support the conclusion that either of the experts' opinions would have changed regarding competency, we reject this claim.

5. MISCELLANEOUS CLAIMS
In his fifth claim, Sweet makes several different subclaims. First, Sweet asserts that the trial court erred in granting an evidentiary hearing on only one aspect of his claim regarding ineffective assistance of counsel during the guilt phase. Second, Sweet claims that the trial court should have considered the additional examples of Adams' ineffectiveness and the State's alleged misconduct in conjunction with his claim that Adams failed to properly investigate other suspects. Finally, Sweet contends that the trial court should have considered the improper actions of the trial judge in conjunction with Sweet's ineffective assistance claim regarding Adams' failure to investigate other suspects. Each of these claims shall be addressed in turn.
Sweet's first subclaim is that the trial court erred in granting an evidentiary hearing on only one aspect of Sweet's ineffectiveness claim. Sweet asserts that he raised three separate bases for Adams' ineffectiveness during the guilt phase in his postconviction motion. These bases were: (1) Adams failed to conduct an adequate pretrial investigation and preparation of the case; (2) Adams failed to investigate and present evidence of other suspects; and (3) Adams failed to properly impeach the State's witnesses, Marcine Cofer and Solomon Hansbury. The trial court granted an evidentiary hearing for only Adams' alleged failure to investigate and present evidence of other suspects. However, during the evidentiary hearing, defense counsel did present evidence in an attempt to establish ineffectiveness under the first and third subclaims.
As this Court explained in Gaskin v. State, 737 So.2d 509, 516 (Fla.1999):
Under rule 3.850, a postconviction defendant is entitled to an evidentiary hearing unless the motion and record conclusively show that the defendant is *869 not entitled to relief. The movant is entitled to an evidentiary hearing on a claim of ineffective assistance of counsel if he alleges specific "facts which are not conclusively rebutted by the record and demonstrate a deficiency in performance that prejudiced the defendant." Upon review of a trial court's summary denial of postconviction relief without an evidentiary hearing, we must accept all allegations in the motion as true to the extent they are not conclusively rebutted by the record.
(Citations and footnote omitted.) Furthermore, a defendant is not entitled to an evidentiary hearing if the postconviction motion is legally insufficient on its face. See Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000); Peede v. State, 748 So.2d 253, 257 (Fla.1999).
In this case, the trial court rejected Sweet's claim that Adams was ineffective for failing to conduct an adequate pretrial investigation and preparation of the case, explaining:
The defendant's first claim under this ground is that counsel allegedly failed to conduct an adequate pre-trial investigation and preparation of the defendant's case. As the defendant acknowledges, the defendant was initially represented by the Public Defender's Office, and his trial counsel was not appointed until five months after the defendant's arrest, only one month prior to when the speedy trial period would have expired. Counsel sought and was granted two continuances of several months in duration for investigative purposes, and two continuances of a few weeks in duration for health reasons. When counsel attempted to obtain yet another, this Court denied that request. The defendant makes the conclusory allegations that his attorney's preparation was inadequate due to counsel's health problems, and due to a break down in communications between he and his attorney. The defendant cites to a statement he made in court as support for his allegation that there was a break down in communications. In point of fact, the defendant's statement clearly shows that the defendant was pushing counsel bring the case to trial, and was unhappy that counsel was not doing so, which is diametrically opposed to counsel being able to take the time to adequately prepare for trial. Further, this Court denied counsel's additional requests for more continuances. This Court finds that this claim is, at best, facially insufficient. The defendant also makes the conclusory allegations that counsel "failed to conduct an adequate voir dire; to object to the introduction of inflammatory and improper evidence; and failed to present adequate argument to the jury." The defendant merely cites to the record on appeal in support of these allegations. This Court finds these allegations to be facially insufficient.
Moreover, with regard to Sweet's assertion that Adams rendered ineffective assistance in failing to impeach the State's witnesses, the trial court made the following conclusion:
The defendant's third claim under this ground is that counsel allegedly failed to properly cross-examine Marcine Cofer and Solomon Hansbury at trial (Hansbury testified at trial regarding the defendant's confession to him). The defendant contends that counsel should have attempted to impeach Cofer's identification of him through evidence of her drug usage. The defendant acknowledges that counsel was restrained in his efforts to do this through a pre-trial order of this Court. The trial transcripts rebut this claim, in that the jury did hear evidence that Cofer sold drugs, used drugs, and that she had drugs in her system on the night of the murder. *870 Moreover, the defendant fails to alleged why the jury would disbelieve Cofer's positive identification of the defendant in the face of such corroborating evidence as the positive identification of the defendant by Sharon Bryant, the defendant's possession of the jewelry he had stolen from Cofer during the prior robbery, and the testimony of the defendant's confession to both Solomon Hansbury and Manuela Roberts. As for Solomon Hansbury, the trial transcripts show that counsel did extensively cross-examine Hansbury and the defendant fails to allege what additional cross-examination counsel should have performed. As part of this claim, the defendant presented the recanted testimony of Hansbury at the evidentiary hearing. However, Hansbury admitted that he is now serving a life sentence without the possibility of parole, that snitches are not highly regarded in prison, and that the inmates consider it an admirable thing to testify on behalf of another inmate. Hansbury's trial testimony was consistent with the other evidence in this case. This Court finds Hansbury's current testimony that he lied at trial to be incredible. This Court finds that there is no reasonable probability that any of the claims raised under this ground would probably have resulted in a different outcome at trial. Williamson v. Dugger, 651 So.2d 84 (Fla.1994); Kennedy v. State, 547 So.2d 912 (Fla.1989).
We agree with the trial court and conclude that these claims are either legally insufficient or conclusively refuted by the record. Also, to the extent that Sweet did introduce evidence at the evidentiary hearing regarding Hansbury, the trial court's factual findings are supported by the record.
Sweet's second subclaim is that the trial court should have considered the additional examples of Adams' ineffectiveness and the State's alleged misconduct in conjunction with his claim that Adams failed to properly investigate other suspects, and that the trial court erred in denying a hearing on these claims. However, because on appeal Sweet simply recites these claims from his postconviction motion in a sentence or two, without elaboration or explanation, we conclude that these instances of alleged ineffectiveness are not preserved for appellate review. See Shere v. State, 742 So.2d 215, 217 n. 6 (Fla.1999); Duest v. Dugger, 555 So.2d 849, 851-52 (Fla.1990).
In Sweet's third subclaim, he asserts that the trial court made various errors throughout his trial, and that he was entitled to an evidentiary hearing on this claim. First, Sweet contends that despite the presentation of evidence supporting several mitigators, the trial court found no statutory and only one nonstatutory mitigating circumstance (lack of parental guidance). Specifically, Sweet contends that he presented the following nonstatutory mitigation in this case: (1) organic brain damage; (2) broken home; (3) difficult and impoverished background; (4) potential for rehabilitation; (5) positive traits; (6) drug abuse problems; (7) alcohol abuse; (8) potential to contribute to society; (9) acceptable behavior at trial; (10) emotional disturbance or instability; (11) personality change from drugs; and (12) mother was an alcoholic. Moreover, Sweet contends that Adams rendered ineffective assistance in failing to effectively use this evidence to argue for a life sentence.
However, we agree with the trial court's conclusion with regard to this claim:
This Court finds this claim to be procedurally barred, in that it could and should have been raised in his direct appeal. Additionally, this Court finds that the evidence presented at the hearing failed to establish his proposed mitigators *871 of "organic brain damage," "potential for rehabilitation," "positive traits," "drug abuse problem," "alcohol problem," "could contribute to society," "emotional disturbance or instability," and "personality change from drugs." The remainder of the proposed mitigators were presented at trial through the testimony of the defendant's sister. As the defendant's quotation from this Court's sentencing order demonstrates, this Court did take into account those factors which resulted in the defendant having a disadvantaged childhood. As the quotation also notes, however, those disadvantages were largely offset by numerous positive influences which would have allowed the defendant to overcome his disadvantages, just as his sister Deonne did. Moreover, had the jury been presented with additional evidence in regard to the defendant's proposed mitigators, the State would have been able to bring out a wealth of evidence of the defendant's anti-social personality. Accordingly, this Court finds that there is no reasonable probability that the jury would have reached a different sentencing decision had they been presented with additional evidence by both parties.
(Citations omitted.)
Second, Sweet contends that he was denied a right to a fair sentencing hearing because the jury was instructed on unconstitutionally vague aggravators. However, this argument appears to be a repeat of his ineffectiveness claim discussed above, and for the reasons already discussed, was properly denied.
Accordingly, we affirm the denial of postconviction relief.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] These aggravators included: (1) Sweet had previously been convicted of several violent felonies, including armed robbery, possession of a firearm by a convicted felon, riot, resisting arrest with violence, and the contemporaneous attempted murders and burglary; (2) the murder was committed to avoid arrest; (3) the murder was committed during a burglary; and (4) the murder was cold, calculated, and premeditated. See id.
[2] The trial court gave this nonstatutory mitigator "slight weight." Id.
[3] The United States Supreme Court denied certiorari. See Sweet v. Florida, 510 U.S. 1170, 114 S.Ct. 1206, 127 L.Ed.2d 553 (1994).
[4] These claims included: (1) Sweet was denied access to public records; (2) the one-year time limitation for filing a rule 3.851 motion for postconviction relief violates Sweet's due process and equal protection rights; (3) the "felony murder" statutory aggravating circumstance constitutes an unconstitutional "automatic statutory aggravating circumstance"; (4) the "avoid arrest" statutory aggravator was inapplicable in this case and the jury was erroneously instructed regarding this aggravator because the trial court improperly failed to further instruct the jury that the aggravator can only be found where it is the "dominant or only" motive for the defendant's commission of the murder; (5) the trial court's jury instruction on the "cold, calculated, and premeditated" aggravator was erroneous because it failed to instruct the jury that this aggravator required "heightened premeditation" and the evidence failed to establish the necessary heightened premeditation necessary to support this aggravator; (6) the Jacksonville Sheriff's Office destroyed all of the evidence in this case, depriving Sweet of his right to conduct an independent analysis of this evidence using his own experts; (7) ineffective assistance during the guilt phase by: (a) failing to conduct an adequate pretrial investigation and preparation of Sweet's case; (b) failing to investigate other possible sources who would have had a motive to kill Marcine Cofer; and (c) failing to properly cross-examine Marcine Cofer and Solomon Hansbury; (8) ineffective assistance by failing to investigate and prepare available mitigation evidence regarding Sweet's background; (9) Sweet was denied his right to a fair trial as a result of his jury being subjected to improper influences; (10) the jury was given inadequate instructions on the "prior violent felony," "great risk," "avoiding arrest," and "cold, calculated, and premeditated" aggravators; (11) Rule Regulating the Florida Bar 4-3.5(d)(4), which prohibits attorneys from interviewing jurors, caused his postconviction counsel to render ineffective assistance of counsel; (12) Sweet is innocent of first-degree murder and innocent of the death penalty; (13) the record fails to show his presence or his counsel's presence at five sidebar conferences and counsel rendered ineffective assistance by failing to object; (14) improper prosecutorial comments during the penalty phase in arguing that the jury should not be sympathetic towards Sweet and ineffective assistance in failing to object to this comment and in failing to request a "mercy instruction"; (15) alleged omissions in the record on appeal deprived him of meaningful appellate and postconviction review and trial counsel rendered ineffective assistance in failing to ensure a complete record; (16) the trial court's failure to ensure that Sweet had a complete record on appeal deprived him of a proper direct appeal; (17) Sweet received a fundamentally unfair trial due to the sheer number and types of errors committed; (18) the penalty phase jury instructions improperly shifted the burden to Sweet to show that death was not the appropriate sentence for the jury to recommend; (19) the State's misleading evidence and improper argument deprived Sweet of a fair trial; (20) Sweet's contemporaneous felonies were improperly used to support the prior violent felony aggravator; (21) the State failed to prove that Sweet "knowingly" created a great risk of causing the death of other persons given that his mental state at the time of the murder prevented him from knowing this fact; (22) the trial court improperly used a prior possession of a firearm by a convicted felon conviction as a statutory aggravator because the conviction was unconstitutionally obtained; (23) Florida's death penalty statute is unconstitutional on its face and as applied; (24) the trial court erred in failing to consider nonstatutory mitigating circumstances; (25) the State's introduction of and argument regarding nonstatutory aggravators deprived Sweet of a fair sentencing recommendation; (26) the State's closing argument and the jury instructions during the penalty phase improperly diminished the jury's sense of responsibility in the sentencing process; (27) trial counsel failed to provide the two court-appointed mental health examiners with sufficient back-ground information to allow them to adequately evaluate Sweet's competency to stand trial; and (28) the mental health officials that examined Sweet failed to render adequate mental health assistance.
[5] Huff v. State, 622 So.2d 982 (Fla.1993).
[6] These issues are: (1) whether counsel was ineffective during the guilt phase for failing to investigate and present evidence of other suspects; (2) whether counsel was ineffective during the penalty phase; (3) whether the trial court erred in failing to consider the cumulative effect of the newly discovered evidence concerning Sweet's innocence with the evidence that was not presented due to trial counsel's ineffectiveness; (4) whether counsel was ineffective regarding Sweet's competency evaluation by a mental health expert; (5) whether the trial court erred in summarily denying a hearing on Sweet's claims related to trial counsel's ineffectiveness and the State's misconduct that must be considered for their cumulative effect on the outcome of the guilt and penalty phases; and (6) whether the record on appeal is so incomplete that Sweet cannot meaningfully raise claims in this appeal. We conclude that Sweet's sixth claim, that the transcript in this case is missing pages 1594-95 and page 1601, and as a result, he is "being denied his right to appeal because this Court's review cannot be constitutionally complete," is without merit because the State correctly explains that the record of the evidentiary hearing in this case is complete.
[7] This testimony is somewhat contradicted by Deonne's testimony at the evidentiary hearing. She stated that Adams spoke to her on the phone several times, and that she went to his office once. She stated that Adams spoke to her more like a friend, telling her about his girlfriends and other unrelated matters. She also claimed that Adams never told her that he tried to get in touch with Sweet's mother during the trial. Nevertheless, the trial court must evaluate the credibility of any witnesses, and we are obligated to give deference to the trial court's factual findings. See Porter v. State, 788 So.2d 917, 923 (Fla.2001).