664 So.2d 242 (1995)
Jerry WHITE, Appellant,
v.
STATE of Florida, Appellee.
Nos. 86900, 86901.
Supreme Court of Florida.
December 1, 1995.
*243 Michael J. Minerva, Capital Collateral Representative; Martin J. McClain, Chief Assistant CCR; Sylvia W. Smith, Assistant CCR and Todd G. Scher, Assistant CCR, Office of the Capital Collateral Representative, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General and Richard B. Martell, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal circuit court orders denying Jerry White's Florida Rule of Criminal Procedure 3.850 motion for postconviction relief, denying his application for stay of execution, and denying his complaint for disclosure of public records. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
White was convicted of robbing a small grocery store in Taft, Florida, and shooting a customer to death. Both the customer as well as the store's owner were shot execution-style in the back of the head. The customer died on the scene, and the owner, who was paralyzed from the neck down, died several years later. We affirmed the murder and robbery convictions and sentence of death. White v. State, 446 So.2d 1031 (Fla. 1984).
After the governor signed the first death warrant, White filed an application for stay of execution and a rule 3.850 motion for postconviction relief in the trial court. The court granted the stay but denied the motion following an evidentiary hearing. We affirmed the denial. White v. State, 559 So.2d 1097 (Fla. 1990). The trial court denied White's second rule 3.850 motion without an evidentiary hearing after the governor signed the second death warrant. We affirmed the denial. White v. State, 565 So.2d 322 (Fla. 1990). We also denied White's petition for writ of habeas corpus and request for stay of execution. White v. Dugger, 565 So.2d 700 (Fla. 1990).
The governor recently signed a third death warrant and the trial court conducted a hearing and heard oral argument but reviewed no evidence on White's third 3.850 motion and request for stay of execution. The court denied relief and White appeals, raising four issues.[1]
White asserts that the trial court erred in denying relief on his claim under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the State withheld exculpatory evidence. For purposes of expediency, the State conceded below that the materials in issue constituted newly discovered evidence cognizable under rule 3.850.
*244 The United States Supreme Court ruled in Brady that the State cannot suppress material evidence:
We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment... .
Id. at 87, 83 S.Ct. at 1196. The Court later explained the meaning of "material" in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985):
The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.
Id. at 682, 105 S.Ct. at 3383.
White's Brady claim is based on the following materials: the written statements of Henry Tehani and his twelve-year-old daughter and the reports of two officers. We find that these materials fail to satisfy the materiality requirement of Brady since there is no reasonable probability that the result would have been different had these materials been disclosed.
White next asserts that his trial counsel was ineffective under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because he failed to argue to the jury the fact that White has a low I.Q. as evidenced by a presentence investigation report ("PSI"). White asserts that this claim is not time-barred by rule 3.850's two-year limitation because the PSI is newly discovered evidence: Although it was prepared in conjunction with an earlier conviction and was disclosed to trial counsel at the time of trial, CCR did not learn of its existence until recently.
This claim is procedurally barred. The PSI report was in trial counsel's possession at the time of trial and could have been timely discovered with due diligence by collateral counsel and raised in White's initial rule 3.850 ineffectiveness claim. Further, collateral counsel raised the "low IQ" issue in both White's first 3.850 motion and the appeal of the denial of that motion. He stated in the latter, "For example, [trial counsel] failed to introduce competent evidence of Mr. White's low I.Q., and instead ventured to establish the opposite by trying to get that evidence in through the hearsay and unqualified testimony of White's mother." The present claim is successive.
Even if this claim were not procedurally barred, it is insufficient to support an ineffectiveness claim. The United States Supreme Court set out the standard for determining ineffectiveness of trial counsel in Strickland:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.
Id. at 687, 104 S.Ct. at 2064. The Court explained further what it meant by "deficient":
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance... .
Id. at 689, 104 S.Ct. at 2065 (citation omitted).
Under this standard, trial counsel's performance was not rendered deficient by his failure to present to the jury data concerning White's low IQ as evidenced in the PSI report. *245 The trial record contains extensive evidence documenting the deliberate nature of White's actions before, during, and after the crime. White himself took the stand and gave a detailed account of the crime and his actions. We note that trial counsel presented five witnesses in mitigation during the penalty phase.
We find the remainder of White's claims procedurally barred or without merit.
It is so ordered.
GRIMES, C.J., and OVERTON, HARDING and WELLS, JJ., concur.
ANSTEAD, J., dissents with an opinion, in which SHAW and KOGAN, JJ., concur.
NO MOTION FOR REHEARING WILL BE ALLOWED.
ANSTEAD, Justice, dissenting.
The thoroughness and quality of this Court's review is relied upon by our society as an important safeguard for preventing executions where a serious question remains as to the fairness of the proceedings leading up to the imposition of the death penalty. That reliance is to be expected, even though it places an enormous burden on this Court. Indeed, simultaneously with the decision rendered in this case on a split vote, we have issued a unanimous opinion rejecting the appeal of another defendant scheduled for execution during the same time as appellant.[2] In my view, however, there remains a serious question of the fairness of the proceedings herein.
One critical issue before this Court is whether the appellant is entitled to an evidentiary hearing to fully consider his claim of ineffective assistance of counsel before he is executed.[3] Among his claims is one alternatively alleging the discovery of new evidence that he was brain damaged and mentally retarded at the time of his original trial, and that his appointed counsel was ineffective because he failed to present mitigating evidence of the brain damage/mental retardation at the penalty phase proceeding before the jury and judge.
To set the stage for consideration of White's claim, we must first confront the filing of an extraordinary affidavit by the state prosecutor who prosecuted this case. The prosecutor states his candid belief that, because of the incompetency of counsel, appellant did not receive an adequate penalty phase hearing.[4] In addition, the claim of *246 brain damage/mental retardation stands unrebutted at this time. Professional opinions and affidavits, as well as other evidence, are attached to appellant's petition for postconviction relief. It is also undisputed that brain damage/mental retardation has not been alleged in any previous claim and, in fact, the State, in the proceedings below, did not challenge appellant's assertion that this evidence could not have been discovered earlier by the exercise of due diligence. The trial court expressly ruled that it was "viewing the evidence as to ineffective assistance of counsel as not being time barred." The court framed the issue:
I think it's new evidence. So what I've attempted to do is accept it at this point as being true without an evidentiary hearing and saying under Strickland, if I were to accept that as true, is it sufficient in my mind to have changed the outcome of the trial.
The state made no claim before the trial court that appellant's mental retardation/brain damage had been raised in a prior claim. As noted in the majority opinion, the PSI containing the information about mental retardation was received by defense counsel at the beginning of the penalty phase of the trial. Defense counsel in his affidavit in these proceedings acknowledges that he received this information but did nothing with it.[5] It is trial counsel's failure to do his job in adequately investigating appellant's alleged mental retardation/brain damage that constitutes the basis of this ineffective assistance of counsel claim.
Finally, and most critically, it is apparent from this Court's original opinion affirming appellant's death sentence that the existence of mitigating evidence like brain damage/mental retardation would make a significant *247 difference in appellant's sentencing and especially in this Court's review of the sentence. On direct appeal, this Court struck two of four aggravators found by the trial court, including the very substantial aggravator of cold, calculated, and premeditated. Nevertheless, while we would ordinarily remand for a new sentencing hearing after striking two of four aggravators, we went on to expressly affirm the death sentence for White because there were no mitigating circumstances:
When there are one or more valid aggravating factors which support a death sentence, in the absence of any mitigating factor(s) which might override the aggravating factors, death is presumed to be the appropriate penalty.
White v. State, 446 So.2d 1031, 1037 (Fla. 1984). While this Court's holding in White was flawed in light of the U.S. Supreme Court's subsequent decisions in Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), and Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991),[6] it is apparent that, even if we accept our decision as correct, the existence of the substantial mitigation now asserted would have caused a different result in our review.[7] We said as much by relying on the absence of mitigation in our decision to affirm after striking two statutory aggravators.
This Court has stepped up to the plate before in being certain that we apply the prevailing standards of the law to death penalty cases. In the seminal case of Proffitt v. State, 510 So.2d 896 (Fla. 1987), we retreated from several of our own prior decisions upholding Proffitt's death sentence and declared:
We recognize that Proffitt is a case of considerable notoriety because it resulted in the United States Supreme Court's upholding the facial validity of Florida's death penalty statute. The death sentence law as it now exists, however, controls our review of this resentencing. There have been multiple restrictions and refinements in the death sentencing process, by both the United States Supreme Court and this Court, since this matter was first tried in 1974 and affirmed in 1975, and we are bound to fairly apply those decisions.
Id. at 897. We set aside Proffitt's death sentence based on changes in the law of proportionality. We need not go so far here. However, we should not hesitate to acknowledge that our prior review of White's case did not measure up to the requirements of the United States Supreme Court in Clemons and Parker, and, more importantly, acknowledge that the substantial mitigating evidence of brain damage/mental retardation adduced here should have been presented to White's penalty phase jury and the sentencing judge. Confidence in the outcome here, White's execution, is substantially undermined by our failure to act.
SHAW and KOGAN, JJ., concur.
NOTES
[1] White makes the following claims: 1) Exculpatory evidence was not presented to the jury; 2) the trial court erred in denying White's request for grand jury transcripts; 3) the lower court failed to review materials withheld by the State; 4) White has been denied effective assistance of collateral counsel.
[2] See Atkins v. State, 663 So.2d 624 (Fla. 1995). There is also a serious question as to the capacity of this Court to entertain emergency proceedings simultaneously in two cases where executions are scheduled within a few days. It is almost an impossible task for each judge of this Court to consider the extensive records and filings in such cases and effectively participate in an orderly decision-making process that will result in an outcome in which we can have a high degree of confidence.
[3] Among the other issues raised by appellant, and that presently stands unrebutted, is one that claims the state has, until this week, withheld substantial evidence that would have been helpful to the defense. Included within that evidence, just ordered to be produced by the trial court under the public records law, are statements by witnesses that appear to vary from the testimony and evidence presented at trial. One eyewitness makes no mention of White's attempt to shoot him and states that White was obviously drunk or on drugs at the time of the crime. Other statements shed light on the sequence of shootings inside the grocery store where the murder victim was killed and the appellant was seriously wounded. While it is difficult to assess this previously undisclosed evidence and its impact under the current time constraints, it is apparent from a superficial examination that an evidentiary hearing is required.
[4] The prosecutor's affidavit states:

1. My name is Francis Wesley Blankner, Jr. I am an attorney in private practice in Orlando, Orange County, Florida. I am a board certified criminal trial specialist. In 1982, I was employed as an Assistant State Attorney in Orlando, and prosecuted Jerry White for first-degree capital murder. I was the trial prosecutor. Mr. White was found guilty of murder, and sentenced to death by Judge Stroker.
2. Mr. White was represented at trial by attorney Emmett Moran. At the time I was familiar with Mr. Moran and his reputation. When I learned that Mr. Moran would be representing Mr. White, I was concerned. My concern was as to whether Mr. Moran was up to the task of representing a capital defendant. However, as the prosecuting attorney I was not in the best position to question the abilities of the defendant's counsel. I felt somewhat torn by an ethical dilemma. Since Mr. Moran was known to have had a drinking problem, I decided to monitor Mr. Moran during the trial for signs of alcohol consumption. As I testified to in 1986, I regularly smelled his breath during the trial to make sure that he had not been drinking alcoholic beverages.
3. Even though I detected no smell of alcohol, I did notice that Mr. Moran appeared confused or fatigued at times during the trial. Because of my concerns about Mr. Moran, I readily agreed to continuances. I hoped that giving Mr. Moran more time would help him get prepared to represent Mr. White. Judge Stroker also seemed anxious to accommodate Mr. Moran. I recall that the trial proceedings generally did not start before 10:00 am. Even at that, it was not unusual for Mr. Moran to be late. He also frequently complained of not feeling well or acted fatigued, particularly in the afternoons.
4. At the time, I did not know whether Mr. Moran's seeming confusion or fatigue [was] genuine or a ploy. Long after the trial and long after the 1986 evidentiary hearing, I learned through Mr. Moran that he in fact had been physically ill at the time of the White trial, a matter Mr. Moran professed he was not aware of at the time of trial. I did not tell Mr. White's collateral counsel about this until November of 1995.
5. In reflecting back upon Mr. White's penalty phase, no real sense of who Jerry White is was provided by the defense. Even though Mr. Moran was given a two day continuance to prepare for the penalty phase, little insight into Mr. White was provided. Certainly by today's standard, the penalty phase appeared inadequate.
In addition to the prosecutor's affidavit, an affidavit was filed by former defense counsel acknowledging his inadequate performance and attributing it to his diabetes. In that affidavit, trial counsel acknowledges:
One of the matters that was not adequately presented at Jerry's sentencing was his IQ score of 72, which is located in a PSI report from 1967. I had a lot of trouble getting information about Jerry's priors, particularly prior PSIs, and had to ask Judge Stroker for an order to get this information from the state. I do recall getting a portion of a PSI on the day of the penalty phase which revealed Jerry's low IQ, but by that point I was very tired and overwhelmed by the fact that Mr. White had been found guilty and was facing the death penalty. The 72 IQ did not get presented to the jury. I am aware that other defendants have been given life sentences because of low IQ scores. Moreover, because of the attacks made against me in 1985, I did not discuss the 72 IQ with Steve Malone [White's successor attorney].
[5] Appellant's mental retardation/brain damage has not been raised as a ground for relief in any prior claims for post-conviction relief. (See this Court's prior opinions cited in the majority opinion.) As already noted, the State made no claim before the trial court that it had been raised. The only reference in any way to this matter is contained in one sentence of the argument section of a trial memorandum and an appellate brief which cites, as an example of defense counsel's "unfocused and bumbling" trial manner, to the fact that defense counsel simply questioned, out of the blue, appellant's mother as to whether appellant had a low IQ. The appellant's mother emphatically denied that he did. This was the only attempt by trial counsel to investigate appellant's mental problems. Obviously, this was not adequate.
[6] In Hill v. State, 643 So.2d 1071 (Fla. 1994), cert. denied, ___ U.S. ___, 116 S.Ct. 196, ___ L.Ed.2d ___ (1995), we noted that Clemons requires that we "must state that error is harmless beyond a reasonable doubt and must explain in a detailed explanation based on the record why the error is harmless." Id. at 1072. We have never done that in White's case. We also acknowledged in Hill our responsibility under Parker to expressly consider all mitigating evidence in the record in conducting a harmless error analysis. We have never complied with the requirements of Clemons or Parker in White's case. In Parker the Supreme Court held that this Court could not conduct a harmless error evaluation without considering the nonstatutory mitigation in the record. In our opinion in White, we noted the nonstatutory mitigation considered by the trial court, but, in our decision to affirm, we not only failed to analyze the evidence of mitigation, but also characterized the record as indicating "the absence of any mitigating factor(s)." 446 So.2d at 1037. We have demonstrated our willingness to correct Parker and Clemons errors by doing so in Hill. There is no reason for us to deny White the same relief.
[7] We have consistently characterized mental mitigation as one of the "weightiest mitigating factors." Santos v. State, 629 So.2d 838, 840 (Fla. 1994); see also Hildwin v. Dugger, 654 So.2d 107 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 420, ___ L.Ed.2d ___ (1995).