862 So.2d 68 (2003)
Edwin TORO, Appellant,
v.
STATE of Florida, Appellee.
No. 5D03-902.
District Court of Appeal of Florida, Fifth District.
November 7, 2003.
Rehearing Denied January 9, 2004.
*69 Brett McIntosh of SypulaMcIntosh, Sarasota, for Appellant.
Edwin Toro, Bushnell, Pro Se.
No appearance for Appellee.
MONACO, J.
In 1993, Edwin Toro was convicted of three counts of sexual battery, 28 counts of sexual activity with a child, and one count of battery. He was acquitted for four other charges. The victim was his minor stepdaughter. Mr. Toro's plenary appeal from his judgment and sentence was affirmed in Toro v. State, 642 So.2d 78 (Fla. 5th DCA 1994). In 1996, he filed a Rule 3.850 motion with the trial court asserting that his trial counsel conducted an inadequate pre-trial investigation. The trial court denied the motion, and this court affirmed. Toro v. State, 689 So.2d 1086 (Fla. 5th DCA 1997). A petition by Mr. Toro for a writ of habeas corpus was denied in 1998. Mr. Toro now appeals the order of the trial court summarily denying his second Rule 3.850 motion, in which he alleges that his sentence should be vacated in light of newly discovered evidence. Because the evidence is not newly discovered, we affirm.
At trial, Mr. Toro's stepdaughter testified in excruciating detail, covering at least 100 pages of transcript, concerning the sexual crimes purportedly committed by Mr. Toro and suffered by her from the time she was nine years old until she was 15 years old. She testified further that she had not been sexually active with any other person during that time. The defense brought forth evidence, however, that the victim had been sexually involved with a boyfriend. Specifically, a medical professional employed by the Department of Health and Rehabilitative Services said that when the victim sought an abortion, the victim reported that she had sexual relations with a boyfriend. A second witness, an expert on sexual abuse, also testified that the victim told her she was having relations with a boyfriend. All of this testimony was before the jury when it evaluated the evidence.
In Mr. Toro's current Rule 3.850 motion he attaches a sworn statement from a gentleman named Oscar Ortiz acknowledging that Mr. Ortiz had a sexual relationship with the victim during a four month period near the end of the alleged abuse of the victim by Mr. Toro. Mr. Toro says in his motion that the affidavit shows that "someone other than the defendant could have been responsible for [the victim's] pregnancy," and that it is "directly inconsistent with [the victim's] statement that prior to her abortion in 1989, she had had no sexual relations with anyone other than the defendant."
The fact is that the victim in the present case was cross-examined by Mr. Toro's counsel regarding her other sexual activities, and other witnesses testified that she told them that she had relations with a boyfriend. Setting aside the fact that having sex with a boyfriend does not mean that Mr. Toro was not also forcing himself upon the victim, simply putting a name to *70 that boyfriend does not amount to new evidence.
Moreover, as the trial court pointed out, Mr. Toro fails to establish that the "newly discovered evidence" could not have been earlier ascertained through the exercise of due diligence. See generally, Jones v. State, 591 So.2d 911 (Fla.1991). Although Rule 3.850 claims that could have been raised in a prior postconviction motion are, as a general proposition, procedurally barred, the supreme court has held that a defendant may file successive postconviction relief motions that are based on newly discovered evidence. See White v. State, 664 So.2d 242, 244 (Fla.1995). In order for the purported evidence to be "newly discovered," however, a defendant must show that the facts upon which the motion is premised could not have been discovered with due diligence and raised in an initial Rule 3.850 motion. See Owen v. Crosby, 854 So.2d 182 (Fla.2003).
The record before us demonstrates that Mr. Toro was aware of the possible relationship between Mr. Ortiz and his stepdaughter as early as July of 1995. We know this because Mr. Toro's earlier Rule 3.850 motion asserted that if his counsel had been more diligent in his pretrial investigation, he "would have discovered that [the victim] was sexually active with boyfriends Oscar Ortiz and Hilton Ayala at relevant times." Thus, the very issue now raised under the newly discovered evidence theory was considered and rejected by this court in 1996 under an inadequacy of counsel theory.
In the final analysis, the jury heard extensive testimony from the victim, the defendant, two witnesses who said the victim was having unprotected sex with other persons, a witness who saw Mr. Toro on top of his stepdaughter apparently having sex, and many others. The fact is that the jury believed the stepdaughter, despite the allegations of her other sexual activities, and did not believe Mr. Toro. Nothing Mr. Toro has brought to us in the current Rule 3.850 appeal compels us to second-guess the jury's determination at this late date.
AFFIRMED.
THOMPSON, J., concurs.
GRIFFIN, J., dissents with opinion.
GRIFFIN, J., dissenting.
Edwin Toro ["Toro"] appeals the denial of his motion for post-conviction relief based on newly discovered evidence. The motion was denied without a hearing. Because I conclude this claim merits a hearing, I would reverse.

Background
In 1979, Toro, at age sixteen years old, met twenty-year-old Madeline Muniez ["Madeline"] in New York. Madeline at that time had two children, D.T. and J.T. Toro's relationship began with Madeline and they moved in together in New York and eventually were married to each other in Milford, Massachusetts in 1984. They moved to Orlando, Florida, in 1985 and remained married until 1990. Both J.T. and D.T. were formally adopted by Toro during the marriage. They also had a son, E.T., born during the marriage. In 1993, Toro was convicted of multiple counts of sexual battery on a child and sexual activity with a child and sentenced to life in prison. D.T. was the alleged victim.
D.T. testified at trial that the sexual abuse or assaults upon her by Toro began at nine years of age in Milford, Massachusetts, which included acts of oral sex, both fellatio and cunnilingus, vaginal sexual intercourse and anal sexual intercourse. She testified that these above described sexual activities occurred several times a week or daily, and all of these types of sexual activity occurred during most of her *71 sexual encounters with Toro. She testified there were a couple of periods of inactivity when Toro, Madeline, D.T. and brother J.T. moved from Milford, Massachusetts, to Orlando, Florida. In March 1986, the family moved to a single-family residence on Moonglow Boulevard in Orlando. The amended information alleged that Toro committed thirty-seven counts of sexual battery on D.T. at this residence.
D.T. testified that, at this residence, Toro had sexual relations with her from 1986 through May 21, 1990, on an average of approximately three hundred days a year. She described having sexual relations on a daily or every other day basis with Toro. She described having oral sex, both fellatio and cunnilingus, vaginal intercourse and anal or rectal intercourse on most of these occasions. She said they had sexual intercourse in most of the rooms of the house.
On May 23, 1990, while D.T. and her school girlfriend, Cynthia Serrano, were skipping school, D.T. told Cynthia that Toro had been sexually molesting her. D.T. testified that prior to this date, she had not been permitted to date or have boyfriends and that she never had sexual relations with anyone other than Toro. D.T. said that she had kept quiet about the abuse because he was violent toward her and other family members and she was afraid.
Madeline, D.T.'s mother, testified at trial that she was never aware of any sexual abuse or molestation until her daughter's call to her at work from Cynthia Serrano's home on May 23, 1990. D.T. was hysterical and crying and told her mother over the telephone of Toro's sexual assaults. The police were called on this date and the investigation began.
For reasons never satisfactorily explained, D.T. was not medically examined.[1] There is some suggestion that this was because the child protection team did not like to examine children older than seven or because D.T. had reported to Linda Harju ["Harju"], the HRS case worker, that she had recently begun having sex with a "boyfriend." At trial, D.T. denied making this statement to Harju.
Because there was no physical evidence, the State's case depended on D.T.'s testimony and her credibility was critical. Toro testified at trial, denying that he ever had sexual relations of any sort with D.T. and denying any wrongdoing with regard to her.
Toro's claim of "newly discovered" evidence consisted of a sworn statement given by one Oscar Ortiz ["Ortiz"], who described an active sexual relationship with D.T. beginning in February 1989 and continuing through the events of May 1990 and beyond. The significant factual content of this sworn statement by Ortiz was summarized by Toro in his motion:
a. He began dating [D.T.] in February 1989;
b. [D.T.] was 14 at the time;
c. [D.T.] had been going out with another gentleman by the name of Hilton Ayala;

*72 d. Hilton Ayala had indicated to Oscar that he and [D.T.] had had sex;
e. Oscar Ortiz began having sex with [D.T.] approximately two days after they began dating;
f. Oscar Ortiz and [D.T.] continued to have a sexual relationship from February 1989 to June 1989, and then after;
g. Oscar and [D.T.] would have sex every day or every other day;
h. Oscar and [D.T.] would skip school to have sex;
i. Oscar would also sneak into the Toro home to have sex;
j. Oscar and [D.T.] were having unprotected sex;
k. [D.T.] was happy-go-lucky and did not indicate problems with Edwin Toro;
l. Edwin Toro was strict with [D.T.] about school and imposed rules against dating;
m. After [D.T.'s] allegations, Edwin Toro was gone
n. When Edwin Toro moved out, Oscar Ortiz moved in at the request of [D.T.'s] mother;
o. After Edwin Toro left, [D.T.'s] mother was often out at clubs;
p. After Edwin Toro left, [D.T.] was able to date freely and quit school;
q. Oscar Ortiz did not learn that Edwin Toro had been arrested until 1995;
r. Ortiz was previously approached by a detective working on behalf of Edwin Toro, but claimed to know nothing;
s. After seeing a transcript of [D.T.'s] untruthful testimony at trial, Oscar Ortiz decided to come forward.
If believed, the testimony of Oscar Ortiz would fundamentally impact the State's case.
There was additional testimony that the State relied upon at trial to corroborate D.T.'s accusations, all of which was problematic. In April 1989, D.T. had a second trimester abortion, unknown to her mother who was in New York nursing her sister, Yvette, who was dying of AIDS. D.T. alleges she became pregnant as a result of her sexual encounters with Toro and was emphatic that she had not had sex with anyone else.
Clinic records showed that Toro had taken D.T. to the abortion clinic. He testified he took her because she came to him for help. She was afraid she was pregnant from sexual activity with her boyfriend. Toro claims D.T. told him that she was afraid to tell her mother about it because of how she would react and she did not want to burden her mother at a time when her sister was dying of AIDS. Clinic records indicate that neither he nor D.T. attempted to conceal their identities. Toro used his real name and represented himself to be her father.
A portion of the clinic records apparently were not given to Toro's attorney prior to trial. These records contain the notation that D.T. told clinic personnel that she had been sexually active for one and one-half years prior to April 1989. This record surfaced when the abortion clinic record custodian testified for the State. The untimely production of this record at trial was a major issue dealt with at length by the parties and by the trial court. Toro sought a mistrial because he did not have the record or an opportunity to explore its implications, but the trial court refused.
The second corroborating event came from testimony by Madeline and D.T. According to Madeline, Toro picked her up after work on the day she had spoken to D.T. about the sexual assaults. On the way to pick up D.T., Madeline confronted Toro with D.T.'s accusations. When D.T. got into the car, she repeated her accusations, but he denied them. Madeline and D.T. testified that Toro became violent, *73 struck D.T. and drove off, never to be seen again by D.T. or Madeline. The State contended that Toro's departure was "flight" from the scene, evidencing Toro's guilt.
Toro testified that this confrontation never happened. He denied he drove Madeline from work to pick up D.T. He said his wife drove her own car as usual that day to her travel agency business. He simply left the marital relationship that day due to an ongoing antagonism between himself and Madeline. He claimed that he had been dating another woman for some time. Madeline acknowledged that their relationship had already been "on the rocks" for over a year, and she and Toro were heading for a divorce prior to D.T.'s allegations.
The third event involved the testimony of Steven Carmoaga, the son of Madeline's sister, Yvette, who died of AIDS. He was living in the home of Madeline and Toro on May 23, 1990, and had been there for approximately one year prior to D.T.'s accusations of abuse. He testified that he observed Toro one morning shortly before D.T.'s accusations at approximately 5:30 a.m. on top of D.T. as she lay in her bed in her bedroom, apparently having sexual intercourse with her. Carmoaga testified he told D.T. and Madeline about his observations on May 23, 1990, when D.T. made her original accusations, but this evidence was not brought to the prosecution's attention until just prior to the trial.
The credibility of Carmoaga's testimony was in issue because he never told Department of Health and Rehabilitative Services workers, investigators, law enforcement officers or the prosecutor about his incriminating observations. HRS case worker, Linda Harju, who investigated the alleged sexual abuse of D.T. by Toro, testified that she had interviewed Carmoaga, who told her he was unaware of any sexual abuse of D.T. Also, it was undisputed that a source of the serious arguments between Madeline and Toro was the issue of housing Yvette, Carmoaga's mother, in their home after Toro became aware of Yvette's AIDS diagnosis. Toro had insisted that Madeline have her sister return to New York, where Yvette died shortly thereafter.
Finally, and perhaps most troublesome, to corroborate D.T.'s accusations, the testimony of Dr. Deborah Day, a clinical psychologist, was introduced. Dr. Day testified that, based on her interviews with D.T. and her review of the depositions of D.T. and Madeline, D.T. fit the criteria for a diagnosis of post-traumatic stress disorder and, based on D.T.'s version of events, opined that the cause of the disorder was chronic sexual abuse.[2]
Q. Were you able to reach any conclusions with regard to [D.T.] and the issue of sexual abuse?
A. Yes, sir, I was.
Q. And what is that conclusion; what is that opinion?
A. My opinion is that D.T. fits the symptom pattern we see in children who have been chronically sexually abused.
Dr. Day performed no psychological tests on D.T., nor did she review any medical reports or HRS reports to reach her conclusions.
Dr. Day's testimony was the subject of this court's extensive opinion on the direct appeal of Toro's conviction. Toro v. State, 642 So.2d 78 (Fla. 5th DCA 1994). Although we affirmed the conviction based *74 on then-prevailing Florida law, we urged reconsideration of case law that allowed a psychologist to offer an expert opinion in Florida's courts that the alleged victim "had suffered sexual abuse" or that the victim's behavior was "consistent with sexual abuse victimization." We suggested in Toro that Florida's approach, which was not approved in the majority of jurisdictions, was unsound and dangerous. Other opinions in a similar vein followed from other district courts of appeal, and in 1997, the Supreme Court of Florida held that Florida would no longer permit an expert to testify that a victim exhibited symptoms consistent with sexual abuse. Hadden v. State, 690 So.2d 573, 580 (Fla.1997).
Toro did offer a defense at trial in addition to his own testimony. He presented the testimony of an HRS supervisor, Carole Fleming, who had interviewed D.T. twice, once on April 27, 1990, and again on May 9, 1990. These interviews, which predated D.T.'s allegation of sexual abuse on May 23, 1990, had taken place in connection with an investigation of an earlier allegation of physical abuse perpetrated by Toro on J.T., in the context of excessive discipline. She had met with D.T., J.T. and Carmoaga without the parents present. In those interviews, all three told her they were unaware of any physical abuse in the Toro home.

Proceedings on the motion for post-conviction relief based on newly discovered evidence
The trial judge denied the motion for post-conviction relief without a hearing on the ground that the Ortiz evidence was not "newly discovered." The trial court noted that in 1995, Toro had based his motion for post-conviction relief for ineffective assistance of counsel on trial counsel's failure to discover D.T.'s sexual partners. Toro's motion attached a report of a private investigator who had interviewed a number of people about this issue, including two men, Ortiz and Hilton Ayala ["Ayala"], who acknowledged being sexual partners of D.T. It is unclear whether, in denying Toro's motion, the trial judge meant that if this evidence could be discovered in 1994, it could have been discovered in 1993, or if he meant that because it was known in 1994, it was too late to raise it in 2003.
The difficulty with the trial court's reasoning is chronology. Recall that D.T. was adamant in her testimony that she never had sex with anyone other than Toro before May 23, 1990. The important period, therefore, is late 1988 to April 1989, when D.T. had the abortion, and from April 1989 til May 23, 1990.
In the 1995 post-conviction proceeding, even after hiring a private detective to find D.T.'s "boyfriends" and discovering Ortiz and Ayala, Ortiz reported to the investigator that his relationship with D.T. was "around 1991." In his sworn statement given on October 21, 2001, Ortiz said that when the private investigator approached him in 1999, he didn't care about Toro's problem and "blew [the investigator] off." In his 2001 sworn statement, he says that he was having sex regularly with D.T. by early 1989, that he was aware that Ayala was sleeping with her before that and there was at least one boyfriend that he knew of before Ayala. Contrary to the view of the majority, the record does not demonstrate that Ortiz' involvement with D.T. could have been discovered with the exercise of reasonable diligence. The record shows that in 1995, reasonable diligence did not uncover Ortiz' sexual relationship with D.T. during the relevant times. What eventually led to the discovery of Ortiz' evidence (as far as the record shows) was Ortiz' decision several years later to come forward. At the very least, whether the sexual relationship between Ortiz and D.T. could have been uncovered *75 in the exercise of reasonable diligence is a question of fact that should be decided only after a hearing.
The majority's other stated justification for concluding that the evidence was discoverable in the exercise of reasonable diligence was the testimony of Harju and Dr. Day that D.T. admitted to them that she had been having sex with a boyfriend but, as noted above, nothing links this sexual activity to the relevant periods before May 1999. In fact, in her testimony at trial, D.T. indicated that her denial of having sex with others only held true up to the date of her accusation of Toro, not thereafter. What is apparent from the record is that the defense at trial was woeful on this critical point. Defense counsel's attack on this critical issue basically consisted of asking D.T. if she was having sex with others, which only elicited her denial. The name of only two possible "boyfriends" were thrown out to D.T., Pedro Perez and Albert Field, not Ortiz. This again elicited D.T.'s denial. We ought not just assume that trial counsel was not reasonably diligent in failing to uncover Ortiz; a hearing should be held to determine whether defense counsel was reasonably diligent.
When the trial judge denied Toro's 1995 motion for post-conviction relief based on his claim of ineffective assistance of counsel for failing to find D.T.'s other sexual partners, the court, in a one-page order, suggested that evidence of D.T.'s relationship with Ortiz or others would not have mattered to the trial's outcome. For this proposition, he referred generally to the testimony of D.T., Dr. Day and Linda Harju. This has to mean either: (a) that the evidence was overwhelming, which we now know it was not, or (b) evidence identifying sex partners of D.T. was not material in light of D.T.'s having told Harju that she was sexually active with a boyfriend. The problem again is the chronology. The defense of Toro at trial centered on the proposition that Toro was never a sex partner of D.T.'s; and that D.T. had to have had a boyfriend with whom she was having sex in 1988 and 1989, which would explain her pregnancy. The defense never offered any evidence, however, of who this hypothetical boyfriend might be and D.T. herself consistently denied it.
The premise that there were no other sex partners made the abortion testimony especially compelling. In the absence of any corroborating physical evidence, the abortion proved she was having sex, that she had not just made up an accusation, and if there was no evidence that it was anyone else, then it had to be Toro. This made Toro doubly culpable for abusing his child and then cold-bloodedly taking her off to abort his child that she was carrying.
It is, of course, entirely possible that Ortiz has lied in his statement and that D.T. was truthful in her testimony that she never had sex with anyone before May 23, 1990, other than Toro. Ortiz is a convicted felon. He may have a motive to lie. There are discrepancies with the statement previously given to the private investigator. It is also possible that Ortiz is telling the truth about D.T. and that D.T. is telling the truth about Toro. There are many reasons why she may have lied about her sexual history. Nevertheless, if what Ortiz says is true, the fundamental premise on which the trial and conviction of Toro were based collapses. For that reason, it is important that this issue be fully aired in a hearing. This evidence of Ortiz should be heard and cross-examined and evaluated. If believed, its impact on the verdict needs to be carefully considered. For a variety of reasons, there never has been any post-conviction hearing in this case. In the years since the verdict, however, *76 enough has developed to warrant such a re-examination.
NOTES
[1] William Anderson, a forensic pathologist associated with the Orange County Medical Examiners Office in the Ninth Judicial Circuit, who performs examinations of sexual battery and assault victims and who also performs examinations in conjunction with the Child Protection Team on alleged victims of sexual assault and abuse, testified that D.T. should have been examined for evidence of sexual assault since the last alleged sexual battery occurred less than forty-eight hours before her May 23, 1990, accusations. He further testified that her history of having been repeatedly anally penetrated from age nine years through age fifteen, as well as vaginal sexual intercourse, called for her to be examined because signs of trauma from such events would still be present.
[2] Toro points out that one of the facts important to Dr. Day's opinion that D.T. suffered from post-traumatic stress disorder was D.T.'s failing grades in school. If Ortiz is believed, the falling grades are equally well explained by skipping school to have sex with Ortiz.