898 So.2d 25 (2005)
Guillermo Octavio ARBELAEZ, Appellant,
v.
STATE of Florida, Appellee.
Guillermo Octavio Arbelaez, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC02-2284, SC03-1718.
Supreme Court of Florida.
January 27, 2005.
Rehearing Denied March 18, 2005.
*29 Todd G. Scher, Special Assistant, Capital Collateral Regional Counsel, Miami, FL, and Marian Garcia Perez, Assistant CCRC-South, Fort Lauderdale, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Leslie T. Campbell and Debra Rescigno, Assistant Attorneys General, West Palm Beach, FL, for Appellee/Respondent.
PER CURIAM.
Guillermo Octavio Arbelaez, a prisoner under sentence of death, appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 after an evidentiary hearing. Arbelaez also petitions this Court for a writ of habeas corpus. We *30 have jurisdiction. See Art. V, §§ 3(b)(1), 3(b)(9), Fla. Const. For the reasons that follow, we affirm the denial of Arbelaez's postconviction motion and deny his petition for habeas corpus.

I. PROCEEDINGS TO DATE
Arbelaez was convicted in 1991 of first-degree murder and kidnapping in the death of Julio Rivas, the five-year-old son of his former girlfriend, Graciela Alfara. The child died on February 14, 1988, after being strangled and thrown off Key Biscayne's Powell Bridge into the water seventy feet below. The cause of death was asphyxia resulting from both strangulation and drowning. After committing the crime, Arbelaez fled to his family's home in Medellin, Colombia. He later returned to Florida, however, and gave full confessions on audiotape and videotape. Arbelaez admitted that, on the night before the murder, he saw his former girlfriend kissing another man. Deciding that "the best way to get to a woman is through her children," he murdered her son.
The jury at Arbelaez's trial recommended a death sentence by a vote of eleven to one. The trial court found three aggravating factors: the murder was committed in a cold, calculated, and premeditated manner (CCP) without any pretense of moral or legal justification; the murder was especially heinous, atrocious, or cruel (HAC); and the murder was committed during a kidnapping. The court also found one statutory mitigating factor (Arbelaez did not have a significant prior criminal history) and one nonstatutory mitigating factor (Arbelaez exhibited remorse). Agreeing with the jury's recommendation, the trial court sentenced Arbelaez to death.
On direct appeal, we affirmed both the convictions and the sentence. Arbelaez v. State, 626 So.2d 169, 178 (Fla.1993), cert. denied, 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994). After the United States Supreme Court denied his petition for a writ of certiorari, Arbelaez filed a motion for postconviction relief that, as amended, raised twenty-three claims. The trial court summarily denied all relief requested. On appeal, we affirmed the summary denial of all but one. Arbelaez v. State, 775 So.2d 909, 920 (Fla.2000). We concluded that "the trial court erred by failing to conduct an evidentiary hearing as to Arbelaez's claim that trial counsel was ineffective during the penalty phase of his trial for failing to present expert testimony as to his epilepsy and other mental health mitigation and for failing to introduce evidence of his family history of abuse." Id. at 912. The factual allegations that formed the basis of Arbelaez's ineffective assistance of counsel claim were summarized as follows:
Arbelaez contends that testimony was available to show that his life was marked by abuse and deprivation, that he suffered from a lifetime of drug abuse, and that he suffered from mental illness and epilepsy and tried repeatedly to commit suicide; yet no witnesses were called by trial counsel to present this testimony. Arbelaez further contends that trial counsel never had him examined by a competent mental health expert for purposes of presenting mitigation. He asserts that he has now been examined by mental health experts who have found that he suffers from organic brain damage and epilepsy; is mentally retarded; and has an IQ of 67.
Id. at 913. We concluded that, under Ragsdale v. State, 720 So.2d 203 (Fla.1998), Arbelaez had "stated sufficient allegations of mitigation to warrant an evidentiary hearing." Arbelaez, 775 So.2d at 913. We therefore reversed in part and remanded to the trial court for an evidentiary *31 hearing on the one claim of ineffective assistance of counsel during the penalty phase.
On remand, Arbelaez filed a motion to disqualify the trial judge, which she denied as legally insufficient. The court then held the evidentiary hearing for which we had remanded the case. After considering post-hearing memoranda, the trial court denied relief. Just before the court entered its order, Arbelaez filed a supplemental motion under rule 3.850 arguing the applicability of the then-recent United States Supreme Court decisions in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The trial court denied the supplemental claims as untimely and procedurally barred.
Arbelaez now appeals the trial court's order denying postconviction relief, as well as the denial of his supplemental Ring and Atkins claims and the denial of his motion to disqualify. He also petitions this Court for a writ of habeas corpus, raising five separate claims of ineffective assistance of appellate counsel. We examine each of Arbelaez's claims in turn.

II. INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE
We remanded this case for an evidentiary hearing to determine whether Arbelaez's trial counsel, Reemberto Diaz, was ineffective during the penalty phase of trial in his investigation and presentation of mitigation evidence concerning three issues: (A) Arbelaez's epilepsy, (B) his "other mental health mitigation," including possible mental retardation, and (C) his "family history of abuse" in Colombia. Arbelaez, 775 So.2d at 912. The trial court denied relief on all three issues.
We have repeatedly held that to establish a claim of ineffective assistance of trial counsel, a defendant must prove two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Valle v. State, 778 So.2d 960, 965 (Fla.2001) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In Valle, we further explained:
In evaluating whether an attorney's conduct is deficient, "there is `a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,'" and the defendant "bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." This Court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected. Moreover, "[t]o establish prejudice [a defendant] `must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability *32 is a probability sufficient to undermine confidence in the outcome.' " Id. at 965-66 (citations omitted) (quoting Brown v. State, 755 So.2d 616, 628 (Fla.2000), and Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).
After an evidentiary hearing on a claim of ineffective assistance of counsel, we review the deficiency and prejudice prongs as "mixed questions of law and fact subject to a de novo review standard but ... the trial court's factual findings are to be given deference. So long as the [trial court's] decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence." Sochor v. State, 883 So.2d 766, 781 (Fla.2004) (quoting Porter v. State, 788 So.2d 917, 923 (Fla.2001)) (emphasis omitted). Applying this standard of review, we affirm the trial court's decision to deny relief to Arbelaez as to all three issues. We discuss each in turn.

A. Epilepsy
Arbelaez argues that his counsel was ineffective during the penalty phase in presenting evidence of his epilepsy. During the penalty phase, counsel presented three witnesses to testify about Arbelaez's problems with epilepsy. Two lay witnesses testified that they had observed Arbelaez taking epileptic medication. One of them, Adelfa Salazar, described a few "very strong" epileptic seizures he had suffered in her presence. Dr. Raul Lopez, a neurologist, testified that he treated Arbelaez for an epileptic seizure in 1984, four years before the murder. He deemed it "very likely" that Arbelaez had suffered from epilepsy since birth. He testified that, as a youth, Arbelaez had been treated in Colombia with Mysoline, an "anticonvulsion medication" used to prevent epileptic episodes. He testified that two other epilepsy medications, Dilantin and Depakote, were prescribed for Arbelaez after the 1984 incident, but that at times Arbelaez "was not taking his medications as instructed." Dr. Lopez testified that he received three phone calls from emergency room physicians  one in 1986 and two in 1987  about Arbelaez, who "on those three occasions ... had not been taking the medication as instructed." Dr. Lopez admitted, however, that he had "no idea" how much medication Arbelaez was taking at the time of the murder.
Arbelaez argues that counsel should have presented more evidence detailing the state of his epilepsy around the time of the murder in 1988. At the evidentiary hearing, counsel testified that he had pursued the epilepsy issue by consulting with Dr. Lopez. Dr. Lopez informed him that, following an epileptic seizure, an epileptic will not remember the events immediately before the seizure. Because Arbelaez could recall the events surrounding the murder  as illustrated by his videotaped confession, admitted into evidence at trial  counsel concluded that epilepsy had not "played a role" in the crime. He testified that he adjusted his penalty phase strategy accordingly.
The trial court found that counsel had adequately investigated Arbelaez's history of epilepsy and presented it to the jury in the penalty phase. Calling the entire issue a "red herring," the court concluded that Arbelaez "failed to offer ... any evidence relating to [his] epileptic disorder which could have been presented and was not."
Arbelaez has not met his burden of showing that counsel's investigation and presentation of evidence about his epilepsy was "unreasonable under prevailing professional norms and that the challenged *33 action was not sound strategy." Valle, 778 So.2d at 965. The record reveals that counsel did present substantial evidence of epilepsy from three witnesses. The jury heard enough evidence to conclude that Arbelaez had engaged in a lifelong battle with epilepsy and had repeatedly failed, throughout the four years leading up to the murder, to keep the condition under control with medication. Counsel was not deficient in presenting this evidence. Moreover, counsel gave a reasonable strategic explanation for why he did not argue at the penalty phase that Arbelaez committed the crime under the direct influence of his epileptic condition. He explained that Arbelaez's detailed confession did not mesh with Dr. Lopez's assertion that epileptics typically cannot remember the events immediately preceding a seizure. Because of this inconsistency, counsel chose to limit the testimony at the penalty phase to general statements about Arbelaez's epileptic condition. This strategic choice was not deficient.
Arbelaez also fails to establish prejudice. Almost all of the epilepsy evidence presented at the evidentiary hearing was cumulative to the evidence presented at trial. The only significant new evidence was that Arbelaez's epileptic disorder had apparently worsened while he was on death row, most likely due to stress. This post-trial evidence is irrelevant to what counsel could have presented at trial. Arbelaez has not presented any then-available evidence whose exclusion undermines our confidence in the outcome of his trial. See Valle, 778 So.2d at 965; see also Provenzano v. Dugger, 561 So.2d 541, 546 (Fla.1990) (holding that defendant failed to establish prejudice where the additional evidence was largely cumulative). The trial court properly denied his claim.

B. Other Mental Health Mitigation
Arbelaez also argues that counsel was ineffective in his investigation and presentation of "other mental health mitigation evidence" during the penalty phase. Aside from the epilepsy evidence, counsel did not present any evidence about Arbelaez's mental health problems, such as his low intelligence and his history of depression. Instead, counsel portrayed Arbelaez as a reliable, hard-working man who was trusted by others and who, before the murder, was a positive contributor to society. Four lay witnesses testified that Arbelaez was a hard worker. The only reference to Arbelaez's intellectual limitations came in the closing argument, where counsel told the jury:
[Arbelaez] was 30 years old when he committed the crime, but ask yourself also what was his emotional or mental age.... You were able to listen and observe the man describing what he said he did.... You can decide how well he understood the ramifications and the severity, the moral and legal implications of what he did on that day.
Arbelaez contends that, under prevailing professional norms, counsel should have pursued and presented evidence to bolster this undeveloped argument. The trial court disagreed, finding that Arbelaez had demonstrated neither deficient performance nor prejudice. The court concluded that counsel "conducted a reasonable investigation as to the Defendant's mental status" in preparation for the penalty phase and that Arbelaez had presented "no competent evidence ... that the Defendant suffered from any major mental illness ... other than his epilepsy... or that the Defendant is mentally retarded."

1. Deficient Performance
We conclude that counsel did not conduct a reasonable investigation of Arbelaez's *34 mental health status. To the contrary, counsel ignored various red flags indicating that Arbelaez could have significant mental health problems. For instance, counsel clearly knew from the competency and sanity evaluation that Arbelaez had low intelligence and a history of depression. The report of Dr. A.M. Castiello, the psychiatrist who conducted the competency and sanity evaluation in 1990, states that "[c]linically, the defendant is functioning at a low average intellectual capacity." The report recounts Arbelaez's hospitalization at a Colombian mental hospital and his attempted suicides in Colombia. Counsel received confirmation of these facts from family members. For example, in a letter to counsel shortly before the penalty phase, Arbelaez's mother wrote that he "is not normal" and described how, as a youth, Arbelaez "wanted to die," once ingested rat poison, and was repeatedly treated at mental hospitals. Although counsel denied receiving any indication from Dr. Castiello, Arbelaez, or his family members that his client was mentally retarded, he admitted at the evidentiary hearing that "I would not say... that [Arbelaez] is an intelligent man" and that it was "entirely possible ... that someone could have something wrong with them and I would not see it."
Despite the overt indications of Arbelaez's low intelligence and his history of depression, counsel did not arrange a mental health evaluation of Arbelaez for purposes of mitigation. Nor did counsel recall asking Arbelaez's initial defense attorney if any mental health work had been done before his involvement. Had he asked, counsel would have learned that Dr. Merry Haber evaluated Arbelaez briefly in 1988 and 1989 at the request of prior counsel. Dr. Haber concluded that Arbelaez suffered from depression and had "very limited intelligence." While admitting that she "did not find anything that [she] felt at that time required further evaluation" and that she "would not have thought about an IQ test," Dr. Haber testified at the evidentiary hearing that "because [Arbelaez] had a seizure disorder, [she] probably would have recommended a neuro-psychological evaluation" if contacted by counsel before trial. Such a recommendation would have pushed counsel in the same direction as the information from Dr. Castiello and Arbelaez's family members  that is, toward a mental health evaluation for purposes of mitigation.
The lack of a serious and sustained effort by counsel to pursue mental health mitigation, despite various red flags indicating Arbelaez's low intelligence and his history of depression, amounted to deficient performance. Although we have not required a mental health evaluation for mitigation purposes in every capital case, see Sweet v. State, 810 So.2d 854 (Fla.2002); Rutherford v. State, 727 So.2d 216 (Fla.1998), when available information indicates that the defendant could have significant mental health problems, such an evaluation is "fundamental in defending against the death penalty." Bruno v. State, 807 So.2d 55, 74 (Fla.2001) (Anstead, J., concurring in part and dissenting in part). This remains true even when the mental health problems do not appear to rise quite to the level of mental retardation. See, e.g., Crook v. State, 813 So.2d 68, 76 (Fla.2002) ("We have ... elected to ... treat low intelligence as a significant mitigating factor with the lower scores indicating the greater mitigating influence."). A competency and sanity evaluation as superficial as the one Dr. Castiello performed for Arbelaez obviously cannot serve as a reliable substitute for a thorough mitigation evaluation. See Rutherford, 727 So.2d at 222 n. 3 ("We of course recognize that competency evaluations are different from mitigation evaluations, and *35 in no way mean to imply here that one can necessarily take the place of the other."). To conform to the prevailing norms of the legal profession, counsel should have arranged a mental health evaluation for mitigation purposes. See Pietri v. State, 885 So.2d 245 (Fla.2004) ("Counsel contacted at least five experts, and ultimately produced [two] at trial.... This is not a situation in which defense counsel did nothing to secure a mental health expert to evaluate his client. Here defense counsel made a reasonable effort."). Arbelaez has therefore satisfied his burden of showing that counsel's performance in investigating and presenting Arbelaez's mental health problems was "unreasonable under prevailing professional norms." Valle, 778 So.2d at 965.

2. Prejudice
Although we conclude that counsel's performance was deficient, Arbelaez nevertheless failed to prove prejudice. Arbelaez confessed to, and was convicted of, killing a five-year-old boy to exact revenge on his former girlfriend. The trial court found that the murder was cold, calculated, and premeditated, as well as especially heinous, atrocious, or cruel. The jury recommended a death sentence by a vote of eleven to one. To undermine confidence in the outcome of his penalty phase, Arbelaez would have to present fairly strong evidence of mental health mitigation. For instance, "[w]e have held that a new sentencing hearing is warranted `in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage.'" Rose v. State, 617 So.2d 291, 295 (Fla.1993) (quoting State v. Sireci, 502 So.2d 1221, 1224 (Fla.1987)). Arbelaez did not demonstrate at the evidentiary hearing that he suffers from mental retardation, organic brain damage, or any other major mental illness aside from epilepsy.
Arbelaez's strongest evidence of mental health mitigation is that he is of low intelligence (but has a high level of adaptive functioning) and that he was hospitalized with severe depression before moving to the United States (but was never treated or hospitalized for depression during the decade before the murder). This evidence is not strong enough to shake our confidence in the outcome. Arbelaez has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Valle, 778 So.2d at 966.
At the evidentiary hearing, Arbelaez presented evidence that he is mentally retarded. Dr. Ruth Latterner, a neuropsychologist who evaluated him after his direct appeal, testified that he suffers not only from epilepsy, but also from mental retardation and organic brain damage. She testified that Arbelaez has a full-scale IQ score of 67, placing him in the range of "educable mentally retarded," and that his language skills place him between a first- and a third-grade level. These conditions, she testified, "pre-existed" her evaluation. Dr. Latterner was the only expert witness who testified unambiguously that Arbelaez has mental retardation or organic brain damage.
The trial court rejected Dr. Latterner's testimony as having "little if any evidentiary value as it is refuted by other mental health professionals and other evidence, and is otherwise wholly unbelievable." The court emphasized that Dr. Latterner admitted on cross-examination that, in reaching her finding of mental retardation, she looked only at testing results and "refuse[d] to consider" Arbelaez's ability to adapt to his surroundings, even though section 916.106(12), Florida Statutes (2003), defines mental retardation as necessarily *36 including "deficits in adaptive behavior." The court also emphasized that Dr. Latterner refused to consider the possibility that Arbelaez's difficult experiences on death row might have negatively impacted his intellectual functioning and thus his testing results. If they had, the court implied, then Dr. Latterner's findings from 1995 would not accurately reflect Arbelaez's mental condition at the time of the penalty phase in 1991.
The trial court found that the testimony of two other mental health professionals, Dr. Sonia Ruiz and Dr. Haber, "conclusively refute[d]" that of Dr. Latterner. Dr. Ruiz, a clinical psychologist who evaluated Arbelaez at the State's request in 2001, testified that Arbelaez has no mental retardation or "any major thought disturbance [or] psychosis whatsoever." She acknowledged that Arbelaez's testing performances, if analyzed independently, revealed a "borderline level of mental retardation." However, unlike Dr. Latterner, Dr. Ruiz also considered Arbelaez's ability to adapt to his surroundings. She testified that Arbelaez's "adaptive level of functioning was quite high [so] that you cannot label him as mentally retarded." This assessment was echoed, to some extent, by Dr. Haber, who testified for the defense that Arbelaez has "very limited intelligence" and is at least "close" to being "mildly mentally retarded," but also acknowledged that Arbelaez had adapted to his environment and "appeared to be functioning behaviorally within an adequate range." In fact, Dr. Haber admitted that she "would not have thought about an IQ test" based on her brief pretrial evaluations in 1988 and 1989.
The trial court's decision to assign greater weight to the comparatively modest assessments of Dr. Ruiz and Dr. Haber than it assigned to the uncorroborated findings of Dr. Latterner was based on competent, substantial evidence and thus warrants deference on appeal. Sochor, 883 So.2d at 781. This Court "will not substitute its judgment for that of the circuit court on questions of fact and, likewise, on the credibility of the witnesses and weight to be given to the evidence." Id.
Because Arbelaez failed to present competent, substantial evidence that he suffers from mental retardation or major mental illness, his claim now rests upon the uncontested evidence of his low intelligence and his struggles with depression in Colombia, including his suicide attempts. Arbelaez contends that this evidence might have altered the outcome of his penalty phase. We disagree. The jury heard plenty of evidence from which to arrive at a rough estimate of Arbelaez's low intelligence level. Arbelaez testified during the guilt phase of the trial and claimed that the boy's death was an accidental drowning, despite the strong physical evidence of strangulation. The State discredited Arbelaez's testimony by introducing a videotaped confession in which Arbelaez recounted the facts of the crime in detail, making it clear that the crime was both premeditated and deliberate. The jury therefore knew that Arbelaez had enough intelligence to plan and remember the details of the murder, as well as enough intelligence to concoct a patently false story to explain the boy's death. In fact, counsel appealed to the jury during the penalty phase's closing argument to reflect on what Arbelaez's testimony revealed about his intellectual limitations: "[A]sk yourself ... what was [Arbelaez's] emotional or mental age.... You were able to listen and observe the man describing what he said he did."
This case is comparable to White v. State, 664 So.2d 242 (Fla.1995), where we stated:

*37 [T]rial counsel's performance was not rendered deficient by his failure to present to the jury data concerning White's low IQ as evidenced in the PSI report. The trial record contains extensive evidence documenting the deliberate nature of White's actions before, during, and after the crime. White himself took the stand and gave a detailed account of the crime and his actions.
Id. at 244-45.
Although we believe that expert testimony relating to Arbelaez's low intelligence would have been vastly preferable and that counsel was deficient in failing to arrange for such testimony, we are confident that the presentation of such testimony would not have changed the outcome. Given that the jury listened to Arbelaez's testimony and also heard him explain on videotape how he executed a premeditated murder of a five-year-old boy to exact revenge on his former girlfriend, we do not believe that expert testimony about Arbelaez's intellectual limitations, short of mental retardation or major mental illness, would have altered the jury's perceptions to such an extent that it would have been swayed from its nearly unanimous recommendation of death. See Damren v. State, 838 So.2d 512, 517 (Fla.2003) (concluding that counsel was not ineffective in failing to present evidence of minimal brain damage, "in light of the strong [CCP, HAC, and contemporaneous violent felony] aggravating factors which were present"); Sweet, 810 So.2d at 866 (concluding that mitigation evidence of the defendant's "low-average" IQ and his "personality disorder" would not "have led to the imposition of a sentence other than death, given the four strong aggravators" in the case); Brown v. State, 755 So.2d 616 (Fla.2000) (concluding that mitigation evidence of the defendant's low intelligence would not have altered the outcome of the trial, given the presence of strong aggravating factors); Haliburton v. Singletary, 691 So.2d 466, 471 (Fla.1997) (holding that "[i]n light of the substantial, compelling aggravation found by the trial court, there is no reasonable probability that had the mental health expert testified [to his finding of a `strong indication of brain damage'], the outcome would have been different").
Evidence of Arbelaez's struggles in Colombia with depression would have been equally unlikely to sway the jury. Counsel for Arbelaez admitted at oral argument that Arbelaez's suicide attempts and his hospitalization for severe depression all occurred before he moved to Florida as a young man. During the more than ten years that Arbelaez spent outside of Colombia before committing murder at age 31, Arbelaez "just had everyday problems." He was neither hospitalized nor treated for depression. He held numerous jobs and, by all accounts, learned to live independently despite his intellectual limitations. This case is therefore not one in which the defendant could have shown that he was struggling with severe depression and was contemplating suicide around the time of the crime. Rather, Arbelaez struggled with these problems during his youth, more than a decade before the crime, and apparently found a way to control them as an adult.
Again, this potential mitigation evidence is not strong enough to shake our confidence in the outcome of Arbelaez's penalty phase. Arbelaez was found to have committed a revenge murder of a young boy in a manner that was cold, calculated, and premeditated, as well as especially heinous, atrocious, or cruel. The jury recommended a sentence of death by a vote of eleven to one. Evidence that Arbelaez was hospitalized for severe depression as a youth but then did not require treatment or hospitalization for depression at any *38 point during the decade leading up to the murder would not have been nearly enough to counterbalance the powerful aggravating factors in this case. See Breedlove v. State, 692 So.2d 874, 878 (Fla.1997) (finding no prejudice because the case's strong aggravating factors would have "overwhelm[ed]" mitigation evidence of the defendant's history of drug addiction and his troubled childhood); Tompkins v. Dugger, 549 So.2d 1370, 1373 (Fla.1989), cert. denied, 493 U.S. 1093, 110 S.Ct. 1170, 107 L.Ed.2d 1073 (1990) (same); Buenoano v. Dugger, 559 So.2d 1116, 1119 (Fla.1990) ("In our opinion the mitigation evidence ... in no way would be sufficient to overcome the overwhelming evidence presented against [the defendant] at trial.... We do not believe the unfortunate circumstances of Buenoano's childhood are so grave nor her emotional problems so extreme as to outweigh, under any view, the four applicable aggravating circumstances.").

C. Family History of Abuse
Most of Arbelaez's immediate family lives in Medellin, Colombia. Arbelaez argues that counsel was ineffective in failing to call Arbelaez's family members as witnesses during the penalty phase and also in his investigation of Arbelaez's troubled background in Colombia. Aside from Dr. Lopez's general references to Arbelaez's lifelong struggles with epilepsy, counsel did not present any evidence of Arbelaez's background in Colombia. Nevertheless, the trial court concluded that counsel "conducted a reasonable investigation" into Arbelaez's history of abuse in Colombia. The court also concluded that, having "discussed [with Arbelaez] the pros and cons of having his family members testify," counsel had a "reasonable basis" for not calling the family members as penalty phase witnesses.
Two of Arbelaez's family members from Colombia testified at the evidentiary hearing. One of his sisters, Amparo Arbelaez Alvarez, described his childhood in Colombia. She testified to the troubled relationship between their mother and father and to her father's abuse of the children. She testified that her brother was beaten on a daily basis "because he was stupid... [and] was doing really badly in studies." She testified that Arbelaez "wanted to kill himself" and drank poison on several occasions. After one of his attempted suicides, she said, Arbelaez was sent to a mental hospital "far away." Amparo recalled speaking with counsel after trial about obtaining some of her brother's medical records, but she testified that they never spoke about the possibility of her testifying at trial. She claimed that she would have testified if asked. Another one of Arbelaez's sisters, Luz Marina Arbelaez Alvarez, testified to generally the same facts. She, too, recalled that her brother attempted to poison himself and was sent to a mental hospital. She recalled their father beating Arbelaez, and Arbelaez at times "trembl[ing] from hunger." She did not recall speaking with counsel at any point before the trial, but testified that she would have helped with the mitigation effort if asked.
Counsel gave three reasonable strategic rationales for deciding not to call any of Arbelaez's family members to testify at the penalty phase. First, counsel testified that Arbelaez "did not want the family members here." He and Arbelaez agreed, after discussing the issue "at length," that it would be too suspicious and therefore too dangerous for his family members to leave Colombia during a politically turbulent period. When a defendant informs his attorney that he does not want his family members to testify on his behalf, the attorney is generally not found to be *39 ineffective in failing to call the family members as witnesses. See Rutherford, 727 So.2d at 220; State v. Riechmann, 777 So.2d 342, 350 (Fla.2000).
Second, counsel feared that Arbelaez's family members would either contradict Arbelaez's guilt phase testimony or commit perjury, thereby creating a credibility problem. Arbelaez testified at the guilt phase  against counsel's wishes  that the boy's death was an accident, which directly contradicted the story that Arbelaez had told his family. Counsel concluded that, no matter how the family members testified, their testimony likely would weaken the defense. We generally have found that strategic decisions of this sort "do not constitute deficient conduct if alternative courses of action have been considered and rejected." Valle, 778 So.2d at 965.
Third, counsel testified that he feared, based on his personal experience with "several of these cases where children are the victims," that testimony about Arbelaez's "rough childhood" in Colombia would be "very tricky" and might be counterproductive because the murder victim in this case was a five-year-old child. Counsel concluded that it would "do a disservice" to Arbelaez to present such evidence at the penalty phase. Instead, counsel presented testimony that Arbelaez was a hard worker and a good roommate. Counsel was not oblivious to Arbelaez's background in Colombia. He testified that he knew from his correspondence with the family that Arbelaez was poor, lacked an adequate education, struggled with acne problems, attempted to kill himself, and was sent to a Colombian mental hospital. Dr. Castiello's competency and sanity evaluation also recounted some of these facts. Counsel's decision not to present this testimony was a strategic one in which "alternative courses [were] considered and rejected." Gamble v. State, 877 So.2d 706, 714 (2004). Counsel testified that he "thought [his] way through and had planned the best approach to the jury," after receiving "input from [his] client." We have generally denied relief where the attorney's chosen strategy was to "humanize" the defendant rather than to portray him as psychologically troubled. See, e.g., Henry v. State, 862 So.2d 679, 685-86 (Fla.2003); Rutherford, 727 So.2d at 223; Haliburton, 691 So.2d at 471; Bryan v. Dugger, 641 So.2d 61, 64 (Fla.1994).
The combination of these three strategies, if not each alone, provides competent, substantial evidence to support the trial court's ruling that counsel did not perform deficiently in declining to call Arbelaez's family members during the penalty phase. See Hamilton v. State, 875 So.2d 586, 592 (Fla.2004) ("Trial counsel was well prepared and well informed with respect to Hamilton's family, and simply made a reasonable, tactical decision not to present certain family members during the penalty phase ...").
There is also competent, substantial evidence to support the trial court's ruling that counsel reasonably investigated Arbelaez's background in Colombia. Counsel communicated multiple times with Arbelaez's family members about Arbelaez's background, searching for what he said "you could consider ... potential mitigation." Counsel asked the family members to attempt to obtain documentation of Arbelaez's mental health problems. A message that Arbelaez's family members left with counsel's assistant shortly before the trial confirmed that the family was attempting to locate hospital records. However, in a letter sent to counsel shortly before the penalty phase, Arbelaez's mother wrote that she "tried to get [Arbelaez's] medical records from the hospital [but] was not able to obtain them." Counsel also obtained a letter from the Colombian *40 government, dated April 1988, stating that none of Arbelaez's medical records could be found in the historical archives but that the social services department would continue its search.
Counsel reasonably relied on these representations from the people and institutions best positioned to obtain mitigation evidence in Colombia. In hindsight, perhaps counsel could have been more aggressive in his investigation. But "[t]here is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Asay v. State, 769 So.2d 974, 984 (Fla.2000) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). As this Court stated in Marshall v. State, 854 So.2d 1235 (Fla.2003), "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight,... and to evaluate the conduct from counsel's perspective at the time." Id. at 1247 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052).
Arbelaez suggests that counsel should have hired an investigator to travel to Colombia or should have gone to Colombia himself to obtain mitigation evidence. At the evidentiary hearing, Arbelaez introduced three documents from Colombia that his postconviction counsel obtained through investigators: an affidavit from Arbelaez's sixth-grade teacher, who described Arbelaez as a "poor student" with "mental problems"; a letter from Dr. Luis Alfonso Arango Tobon, an emergency doctor with Colombian social services, who had "treated [Arbelaez] for a suicidal attempt and depression" in 1976; and a letter from Dr. Ernesto Botero Ramirez, a psychiatrist who had treated Arbelaez in Colombia with electroshock while Arbelaez was hospitalized for a suicide attempt. Even if Arbelaez had managed to prove deficient performance, these three documents would not suffice to show prejudice. Although the documents do contain some new information  most notably, that Arbelaez was treated with electroshock after one of his suicide attempts  they largely confirm facts counsel already knew from Arbelaez or his family. In particular, counsel knew at the time of the penalty phase that Arbelaez had been poor, had struggled with depression, had attempted suicide, had spent time in a Colombian mental hospital, and had received an inadequate education. Counsel considered asking Arbelaez's family members to testify to these facts. Ultimately, however, he decided not to present testimony about Arbelaez's childhood because he feared it would be counterproductive given that Arbelaez himself had cut short the childhood of his five-year-old murder victim. Arbelaez has essentially presented cumulative evidence to argue against counsel's reasonable strategic choice.
A comparison with the U.S. Supreme Court's recent decision in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), confirms that counsel's investigation of Arbelaez's background satisfied the constitutional requirements. In Wiggins,"counsel abandoned their investigation of [the defendant's] background after having acquired only a rudimentary knowledge of his history from a narrow set of sources." Id. at 524, 123 S.Ct. 2527. In contrast, counsel in this case acquired more than a rudimentary knowledge of his client's background. He testified that, in preparation for trial, he knew most of the major facts about Arbelaez's troubled background. Whereas counsel in Wiggins"abandon[ed] their investigation at an unreasonable juncture," id. at 527, 123 S.Ct. 2527, counsel here never truly abandoned his investigation. Rather, he waited for either Arbelaez's family members or the Colombian government to send him any *41 available documentation of Arbelaez's mental health history as they assured him they would. Counsel's performance was not "unreasonable under prevailing professional norms." Valle, 778 So.2d at 965. The trial court was justified in concluding that counsel did not perform at a constitutionally deficient level in investigating Arbelaez's background in Colombia.

III. OTHER CLAIMS ON APPEAL
We briefly discuss Arbelaez's other claims. These are (A) denial of his motion to disqualify the trial judge; (B) denial of his motion to exclude the testimony of a death row mental health counselor; and (C) denial of his supplemental claims based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

A. Motion for Disqualification
After we remanded to the trial court for an evidentiary hearing, Arbelaez moved to disqualify the trial judge, Leslie B. Rothenberg. He alleged that the judge's comments in a separate capital case, that of Gerardo Manso, Manso v. State, 704 So.2d 516 (Fla.1997), raised a reasonable fear that Arbelaez would not receive a fair and impartial hearing. Manso had alleged in his own disqualification motion that "Judge Rothenberg stated that if found competent to proceed, the Defendant would be getting a jolt of electricity which the undersigned takes to mean a sentence of death." Judge Rothenberg granted Manso's disqualification motion, but later denied Arbelaez's motion as legally insufficient. Arbelaez appeals that denial.
Whether a motion to disqualify the judge is legally sufficient is a question of law we review de novo. See, e.g., Chamberlain v. State, 881 So.2d 1087 (Fla.2004); Barnhill v. State, 834 So.2d 836, 842 (Fla.2002). Such a motion will be deemed legally insufficient if it fails to establish a "well-grounded fear on the part of the movant that he will not receive a fair hearing." Arbelaez, 775 So.2d at 916 (citing Correll v. State, 698 So.2d 522, 524 (Fla.1997)). A mere "subjective fear [ ]" of bias will not be legally sufficient; rather, the fear must be objectively reasonable. Fischer v. Knuck, 497 So.2d 240, 242 (Fla.1986). The primary consideration is whether the facts alleged, if true, would place a reasonably prudent person in fear of not receiving a fair and impartial trial. Id.
Arbelaez failed to allege facts sufficient to establish a "well-grounded fear" that he would not receive a fair and impartial hearing before Judge Rothenberg. Nothing in Arbelaez's motion directly linked the judge's alleged comment in the Manso case to Arbelaez. Although the comment certainly evinced a predisposition regarding the outcome of Manso's case  namely, that Judge Rothenberg intended to impose a sentence of death  the comment did not, on its face, evince a predisposition about all capital cases or show a personal bias or prejudice against Arbelaez simply because he was a capital defendant. Arbelaez, 775 So.2d at 916 (citing Tafero v. State, 403 So.2d 355 (Fla.1981)). Arbelaez essentially argues that Judge Rothenberg was biased toward all capital defendants. As we stated in Maharaj v. State, 778 So.2d 944 (Fla.2000), however, such serious allegations of judicial bias "cannot be left to surmise from differing interpretations." Id. at 952.
Arbelaez also asks us to revisit the denial of his previous, unsuccessful motion to disqualify Judge Rothenberg. See Arbelaez, 775 So.2d at 916. He argues that, in light of the recent allegations in the Manso case, Judge Rothenberg's "tough-on-crime" judicial campaign and her prosecutorial *42 background have taken on new meaning. We decline Arbelaez's request. Nothing about Judge Rothenberg's judicial campaign or prosecutorial background has changed over the past four years. The trial court's denial of Arbelaez's recent disqualification motion, like its denial of his initial disqualification motion, was proper.

B. Testimony by State-Employed Mental Health Expert
Before the postconviction evidentiary hearing, Arbelaez sought to exclude the testimony of Lisa Wiley, an employee of the Florida Department of Corrections who provided mental health services to Arbelaez while he was on death row. Arbelaez argued that Wiley's testimony would violate his Fifth Amendment rights because Wiley interrogated Arbelaez in prison without administering Miranda[1] warnings or obtaining his consent to her testimony. The trial court denied the motion, concluding that Miranda requirements did not apply and that Arbelaez had waived any relevant privilege. Wiley testified at the evidentiary hearing. Arbelaez now appeals the trial court's denial of his motion, arguing that Wiley's testimony violated his Fifth, Sixth, and Fourteenth Amendment rights. Because Arbelaez failed to raise his Fourteenth Amendment claim before the trial court, it is procedurally barred. See, e.g., Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990).
We reject Arbelaez's Fifth and Sixth Amendment claims on the merits. The United States Supreme Court has held that the Fifth Amendment does not apply once the defendant's "sentence has been fixed and the judgment of conviction has become final," which describes the circumstances under which Arbelaez met with Wiley on death row. Mitchell v. United States, 526 U.S. 314, 326, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (citing Reina v. United States, 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960)) ("[W]here there can be no further incrimination, there is no basis for the assertion of the privilege."). Similarly, the Sixth Amendment right to counsel applies to critical stages "of the prosecution," United States v. Wade, 388 U.S. 218, 226, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), not to postconviction meetings after the defendant has been fully prosecuted.
Even if Wiley's testimony at the evidentiary hearing had violated Arbelaez's Fifth or Sixth Amendment rights, we would conclude that those violations were harmless beyond a reasonable doubt. The circuit court did not rely upon Wiley's testimony in reaching its decision to deny postconviction relief.

C. The Supplemental Ring and Atkins Claims
We remanded this case to the trial court solely for an evidentiary hearing on the issue of whether Arbelaez's trial counsel was ineffective in failing to pursue penalty phase mitigation evidence. After the hearing but before a ruling, Arbelaez attempted to supplement his rule 3.850 motion with arguments based on two recent Supreme Court decisions, Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The trial court rejected the supplemental motion as beyond the scope of our remand. We review such decisions under an "abuse of discretion" standard. See Way v. State, 760 So.2d 903, 916 (Fla.2000). Although we recognize that it might have been more efficient for the trial court to hear Arbelaez's Ring and Atkins claims during the remand, we *43 cannot say that the trial court abused its discretion in declining to hear them. The trial court was justified in adhering strictly to our instructions on remand and dismissing the supplemental motion.
For purposes of efficiency, however, we note that Arbelaez's Ring and Atkins claims would certainly fail on the merits. Contemporaneously with the conviction for first-degree murder, the jury also convicted Arbelaez of kidnapping. Id. at 911. That conviction became the basis for one of the aggravating factors the trial court found. See Arbelaez, 775 So.2d at 912. This Court has repeatedly dismissed arguments under Ring where one of the aggravating factors is a previous or contemporaneous conviction. See, e.g., Kimbrough v. State, 886 So.2d 965 (Fla.2004); Douglas v. State, 878 So.2d 1246 (Fla.2004); Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003).
Arbelaez cannot feed Atkins through Ring. He contends that, after Atkins, the absence of mental retardation is now an element of capital murder that, under Ring, the jury must consider and find beyond a reasonable doubt. We have rejected such arguments. See Bottoson v. Moore, 833 So.2d 693 (Fla.2002) (rejecting the defendant's Atkins claim on the ground that the trial judge had found the defendant not to be mentally retarded). Other state supreme courts have reached the same conclusion. See, e.g., Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 619-21 (2003); Russell v. State, 849 So.2d 95, 148 (Miss.2003); State v. Williams, 831 So.2d 835, 860 n. 35 (La.2002). Arbelaez has no right under Ring and Atkins to a jury determination of whether he is mentally retarded.[2]

IV. HABEAS CORPUS
Arbelaez also petitions this Court for a writ of habeas corpus, contending that his appellate counsel, the same attorney who served as his trial counsel, was ineffective in failing to raise five separate issues on direct appeal. The standard of review for Arbelaez's claims of ineffective assistance of appellate counsel "mirrors the Strickland v. Washington standard for claims of trial counsel ineffectiveness." Valle v. Moore, 837 So.2d 905, 907 (Fla.2002). The unique attributes of appellate counsel claims were explained in Valle:
[A]ppellate counsel cannot be considered ineffective ... for failing to raise issues that were not properly raised during the trial court proceedings and do not present a question of fundamental error. The same is true for claims without merit because appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims on appeal. In fact, appellate counsel is not necessarily ineffective for failing to raise a claim that might have had some possibility of success; effective appellate counsel need not raise every conceivable nonfrivolous issue.
Valle, 837 So.2d at 907-08 (citations omitted). We now apply this standard to each of Arbelaez's habeas claims.

A. Admission of Photographs of the Victim's Body
At trial, counsel objected to the admission of every photograph depicting *44 the victim's body. Arbelaez, 775 So.2d at 920. Arbelaez argued in his 3.850 motion that the photographs were prejudicial and cumulative, but we held that his claim was procedurally barred because the issue had not been raised on direct appeal. Id. at 919-20. Arbelaez now argues that his appellate counsel's failure to challenge the admissibility of the photographs amounted to ineffective assistance. We disagree. The admission of photographic evidence is "within the trial judge's discretion and a trial judge's ruling on this issue will not be disturbed on appeal unless there is a clear showing of abuse." Davis v. State, 875 So.2d 359, 373 (Fla.2003) (quoting Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000)). Appellate counsel would not have been able to show an abuse of discretion.
At trial, counsel objected to ten photographs of the victim's body, all of which the court admitted. Four depicted the victim lying on the dock, where he was placed when he was pulled from the water. Six depicted the victim's autopsy. The trial court said of the dock photographs: "I don't find [them] to be excessively gruesome, and they are relevant to show where the child was found ... by the people who brought his body onto the dock." The court initially questioned whether one of the photographs was cumulative, but concluded that it "seems to depict something other than what [the similar] picture depicts ... they are both relevant and they are not excessively gruesome." As for the autopsy photographs, the trial court admitted them after the medical examiner testified they would assist him in explaining to the jury the autopsy and his findings. The autopsy photographs showed injuries to the victim's thigh and torso, as well as various different angles of the injuries to the victim's face and head.
"We have consistently upheld the admission of allegedly gruesome photographs where they were independently relevant or corroborative of other evidence." Czubak v. State, 570 So.2d 925, 928 (Fla.1990). As we stated in Henderson v. State, 463 So.2d 196 (1985), "Those whose work products are murdered human beings should expect to be confronted by photographs of their accomplishments." Id. at 200. All ten photographs were deemed relevant either to the crime scene technician's explanation of the location of the victim's body, to the medical examiner's explanation of the findings of the autopsy, or as proof that the victim was strangled and did not die by accidental drowning as Arbelaez claimed. Each of these is clearly a legitimate basis for admitting photographs of a murder victim. See Hertz v. State, 803 So.2d 629, 641-43 (Fla.2001) (finding no abuse of discretion where the photos were "relevant to show the position and location of the bodies when they were found" and to "assist[ ] the crime scene technician in describing the crime scene" and were "probative of the medical examiner's determination as to the manner of the victims' deaths").
The fact that the victim here was a young child does not alter the analysis. See, e.g., Chavez v. State, 832 So.2d 730, 763 (Fla.2002) (affirming the admission into evidence of allegedly "cumulative gruesome photographs" depicting the body a murdered "little boy"). Nor does the sheer number of non-cumulative photographs. See Nixon v. State, 572 So.2d 1336, 1342-43 (Fla.1990) (rejecting the notion that seven non-cumulative photographs of a charred murder victim "constituted an unnecessarily large number of inflammatory photographs," even though they were "extremely gruesome"). The photographs were not cumulative and were relevant to disputed issues. The trial court did not abuse its discretion in admitting the photographs. Arbelaez has therefore failed to show that his appellate counsel was ineffective, because any challenge *45 to the photographs would have lacked merit. See Valle, 837 So.2d at 908 ("[A]ppellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims on appeal.").

B. Restriction on Defense Cross-Examination as to Bias
Arbelaez also argues that his appellate counsel was ineffective in failing to challenge the trial court's decision to cut off a line of questioning relating to the bias of prosecution witness Pedro Salazar. During the cross-examination of Salazar by counsel, the following exchange took place:
DEFENSE: Where is your father?
SALAZAR: In Colombia.
DEFENSE: Why is he in Colombia?
STATE: Objection. There is no relevance.
COURT: Sustained.... Next question?
DEFENSE: Sir, when was the last time you answer [sic] your father?
STATE: Objection to the question.
DEFENSE: May we approach?
COURT: Yes.
STATE: Go ahead.
DEFENSE: His father is a fugitive from a federal charge. My understanding is that this man is on probation for a money laundering charge. My understanding is that 
STATE: Which man?
DEFENSE: This man over here. There is only one man on the stand here. That is it.
STATE: I'm asking him to ask proper impeachment questions. Counsel knows what the question is. Let him ask it in the appropriate way.
COURT: Please. Why is this relevant, first?
DEFENSE: Judge, this man has been led by the State to answer specific questions in a specific manner, almost like a puppet. When they pull him he say [sic] the right words. He is a fugitive from justice, and that is his father.
STATE: The jury can hear him better than I can right now.
COURT: The objection is sustained.
Although Arbelaez claims that the trial court prevented him from eliciting the fact that the witness, Salazar, was on probation for a money laundering charge, the transcript reveals that the State objected to a line of questioning about the witness's father being a fugitive. Counsel did allude, at sidebar, to the witness being on probation for a money laundering charge, but the questions to which the State objected were not probative of that fact.
Because counsel never asked the witness about his being on probation for a money laundering charge, and because the State never objected to such a line of questioning, no factual basis existed to argue that it was reversible error to restrict questioning about the witness's probationary status. Nor could appellate counsel have argued that it was reversible error for the trial court to restrict questioning related to the witness's father's fugitive status. See Smith v. State, 194 So.2d 310, 312 (Fla. 1st DCA 1966) ("There is no precedent for this novel approach that counsel may attempt to impeach a witness by showing that close relatives of the witness have a criminal record."). Arbelaez's appellate counsel cannot be deemed ineffective for failing to raise an issue that was wholly lacking in factual support.

C. Jury Instructions for the HAC and CCP Aggravators
Arbelaez argued in his 3.850 motion that his trial counsel was ineffective in failing to object to the jury instructions for the "heinous, atrocious or cruel" (HAC) *46 and "cold, calculated and premeditated" (CCP) aggravating factors as being unconstitutionally vague. Arbelaez, 775 So.2d at 919 n. 8. We rejected this claim as procedurally barred because "[o]n direct appeal, Arbelaez did not challenge the vagueness of the HAC and CCP instructions, but only the applicability of these factors to his case." Id. (citing Arbelaez, 626 So.2d at 176-77). Arbelaez now reformulates his argument as a claim for ineffective assistance of appellate counsel.
There is no question that the standard HAC jury instructions in effect at the time of Arbelaez's trial were unconstitutionally vague under the holding of Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), and the standard CCP instructions were unconstitutionally vague under the holding of Jackson v. State, 648 So.2d 85 (Fla.1994). Both Espinosa and Jackson, however, were decided after the trial in Arbelaez's case. Arbelaez did not object to the content of the HAC or CCP instructions at trial. Arbelaez, 775 So.2d at 919 n. 8. For this reason alone, the vagueness of those instructions could not have been raised by Arbelaez's counsel on appeal. This Court has repeatedly held that "[t]he contemporaneous objection rule applies to Espinosa error, i.e., a specific objection on the form of the instruction must be made to the trial court to preserve the issue for appeal." Hodges v. State, 619 So.2d 272, 273 (Fla.), cert. denied 510 U.S. 996, 114 S.Ct. 560, 126 L.Ed.2d 460 (1993); see also Nelson v. State, 850 So.2d 514, 525 (Fla.), cert. denied, 540 U.S. 1091, 124 S.Ct. 961, 157 L.Ed.2d 797 (2003); Melendez v. State, 612 So.2d 1366 (Fla.1992). Similarly, we have required a contemporaneous objection in order to preserve a challenge to vague CCP instructions. See, e.g., Jackson, 648 So.2d at 90 ("Claims that the instruction on the [CCP] aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal.") (citing James v. State, 615 So.2d 668, 669 & n. 3 (Fla.1993)). Because Arbelaez's Espinosa and Jackson claims would have been procedurally barred, his appellate counsel was not ineffective in failing to raise them on appeal.

D. Jury Instructions for the Murder In the Course of a Felony Aggravator
At the penalty phase of Arbelaez's trial, the jury was instructed that it could consider as an aggravating circumstance the fact that the murder was committed during the course of a kidnapping. The State told the jury during its closing argument that this murder in the course of a felony aggravator had already been established by virtue of Arbelaez's contemporaneous kidnapping conviction: "You found that the defendant was guilty of kidnapping, so clearly the murder of [the child] occurred while the defendant was kidnapping this child. There is no question about that." Arbelaez argued in his 3.850 motion that his trial counsel was ineffective in failing to object to the jury instructions for the murder in the course of a felony aggravator, which in his view established an impermissible automatic aggravating factor. Arbelaez, 775 So.2d at 919 n. 8. We rejected his claim as procedurally barred, because it was not raised on direct appeal. Id. Arbelaez now argues that his appellate counsel was ineffective in failing to challenge both the jury instructions and the State's comments during closing argument.
We find no merit to Arbelaez's argument. We have repeatedly rejected defendants' claims that "the aggravating circumstance that the murder was committed in the course of committing a specified felony is unconstitutional because it constitutes an automatic aggravator and does not narrow the class of persons eligible for the *47 death penalty." Ault v. State, 866 So.2d 674, 686 (Fla.2003); see also Hitchcock v. State, 755 So.2d 638, 644 (Fla.2000); Blanco v. State, 706 So.2d 7, 11 (Fla.1997); Banks v. State, 700 So.2d 363, 367 (Fla.1997); Clark v. State, 443 So.2d 973, 978 (Fla.1983). Because Arbelaez's challenge to the jury instructions clearly would have failed on appeal, his appellate counsel was not ineffective in failing to raise the issue.
As to the State's allegedly improper comments during closing argument, Arbelaez would have been procedurally barred from challenging those comments on appeal. This Court has stated that, "[a]s a general rule, the failure to raise a contemporaneous objection when improper closing arguments are made waives any claim concerning such comments for appellate review." Card v. State, 803 So.2d 613, 622 (Fla.2001) (citing Brooks v. State, 762 So.2d 879, 898 (Fla.2000)). Arbelaez did not object to the allegedly improper comments in the State's closing argument, nor did those comments constitute fundamental error for which no objection would be required. See, e.g., Cherry v. Moore, 829 So.2d 873, 882 (Fla.2002) (explaining that improper comments in closing argument must be relatively "egregious" to constitute fundamental error). Thus, Arbelaez waived his right to challenge the State's comments on appeal. Arbelaez's appellate counsel was not deficient in failing to raise a procedurally barred claim.

E. The Vienna Convention
Finally, Arbelaez argues that his appellate counsel was ineffective in failing to challenge the State's alleged violation of the Vienna Convention in its dealings with Arbelaez, who is a Colombian citizen. See Vienna Convention on Consular Relations, April 24, 1963, art. 36, 21 U.S.T. 77, 101, 596 U.N.T.S. 261 (requiring United States authorities to "inform the [defendant] without delay of his rights" to communicate with consular officers from his country of citizenship). Because Arbelaez failed to raise or preserve the issue of the alleged Vienna Convention violation, his appellate counsel would have been procedurally barred from raising the issue on appeal. See, e.g., Riechmann, 777 So.2d at 365 (stating that "appellate counsel cannot be deemed ineffective for failing to raise this [Vienna Convention] issue because it was not raised or preserved at trial"). Again, Arbelaez's appellate counsel cannot be deemed ineffective for failing to raise a procedurally barred claim.

V. CONCLUSION
For the reasons stated, we affirm the trial court's order denying Arbelaez's motion for postconviction relief after an evidentiary hearing, and we deny Arbelaez's petition for habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Arbelaez also asserts that he is preserving his right to request a determination of whether he is mentally retarded for purposes of Atkins. The procedure for requesting such a determination is provided in Florida Rule of Criminal Procedure 3.203, which became effective on October 1, 2004. See Amendments to Fla. R.Crim. P. and Fla. R.App. P., 875 So.2d 563, 565 (Fla.2004). Rule 3.203(d)(4)(E) governs Arbelaez's circumstances. Arbelaez must pursue his mental retardation claim in accordance with the new rule. We express no opinion on the merits of such a claim.